DONALD FLOYD MAGLEY *v.* STATE OF INDIANA.

[No. 574S94. Filed October 21, 1975.]

*Kenneth M. McDermott,* of Plymouth, for appellant.

*Theodore L. Sendak,* Attorney General, *Gary M. Crist,* Deputy Attorney General, for appellee.

DeBruler, J.—Appellant, Donald Floyd Magley, was indicted for First Degree Murder, Ind. Code § 35-13-4-1, being Burns § 10-3401, and Robbery while Armed with a deadly weapon, Ind. Code § 35-12-1-1, being Burns § 10-4709. In a trial by jury, appellant was found guilty of both charges. He was sentenced to life imprisonment for First Degree Murder and to a term of ten to thirty years for Robbery while Armed. On appeal, he presents three issues: (1) whether he was denied the right to effective assistance of counsel when the trial court denied his request for appointment of new counsel; (2) whether the trial court erred in admitting into evidence his out-of-court statement; and (3) whether the trial court erred in admitting into evidence four exhibits.

The evidence which supports the verdict of the jury shows that appellant and three other men met at appellant's apartment in LaPorte on November 8, 1972, and made a plan to rob a filling station that evening. Appellant borrowed a neighbor's car, and the men drove around for hours looking for a likely station. At 3:10 a.m., November 9th, a policeman stopped them for driving without a front headlight, and appellant showed the policeman his driver's license. Finally, at 3:50 a.m., the men stopped at a Clark Service Station in South Bend and determined to carry out their plan. The driver, Terry Jones, told the attendant that he needed a quart of oil. When the attendant returned with the oil, appellant stepped out from the side of the service station with a shotgun. He asked the attendant to walk into the restroom, robbed him of $26.00 and his wallet, and shot him. Appellant then got back into the car, Jones put the oil in the car, and the men returned to appellant's apartment, where they divided the money equally and destroyed the wallet, papers, and shotgun casings.

## I.

Appellant contends that he was denied the effective assistance of counsel at the trial level. He raised this issue in his

motion to correct errors, and the trial judge considered it carefully and rendered a written opinion, overruling the motion on the ground that appellant was unable to point to a single instance where trial counsel had failed to defend properly during the preparation for or conduct of the trial.

Many general rules govern the disposition of this issue on appeal. Counsel is presumed to have prepared and executed his client's defense effectively. *State* v. *Irvin,* (1973) 259 Ind. 610, 291 N.E.2d 70; *Robbins* v. *State,* (1971) 257 Ind. 273, 274 N.E.2d 255. This presumption is rationally grounded in the educational and other requirements for admission to the practice of law, but is rebuttable by strong and convincing proof. *Robbins* v. *State, supra.* In resolving the issue, a court should consider the totality of the circumstances surrounding counsel's pre-trial preparation and the actual conduct of the trial. *Lowe* v. *State,* (1973) 260 Ind. 610, 298 N.E.2d 421; *Blackburn* v. *State,* (1973) 260 Ind. 5, 291 N.E.2d 686; *Sargeant* v. *State,* (1973) 157 Ind. App. 173, 299 N.E.2d 219. Perfunctory representation is not enough. *Wilson* v. *State,* (1943) 222 Ind. 63, 51 N.E.2d 848; *Castro* v. *State,* (1925) 196 Ind. 385, 147 N.E. 321. Counsel must have reasonable time for pre-trial preparation. *Hartman* v. *State,* (1973) 155 Ind. App. 199, 292 N.E. 2d 293. Deliberate choices made by counsel for some contemplated tactical or strategic reason which turn out to be detrimental to the client's cause do not establish ineffective representation. *Henry* v. *Mississippi,* (1965) 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408; *Lowe* v. *State, supra.* From August 9th to the conclusion of his trial, appellant had two lawyers appointed to represent him. One was appointed in St. Joseph County, the county in which the case originated; the other was appointed in Marshall County, the county to which the case was venued.

Appellant, while conceding his counsel's competency, argues that he had irreconcilable conflicts with them and that, by reason of these conflicts and an absence of rapport, counsel

were rendered ineffective. Appellant first presented his complaints against his lawyers to the trial court before trial, on October 8th at the end of the pre-trial conference and on October 13th. His complaints focused on the failure of counsel to undertake adequate preparation to present appellant's alibi defense and the failure to consult appellant before petitioning the court for permission to hire a medical expert to examine appellant. The trial court had a hearing on October 13th, determined that defense counsel was representing appellant effectively in spite of the conflicts between appellant and his counsel, and refused to appoint substitute counsel.

We find that the pre-trial ruling of the trial court, denying appellant's request for appointment of substitute counsel, was not error. The decision of the court to retain appellant's present counsel was supported by the fact that counsel had filed pre-trial motions for suppression of a confession, discovery, appointment of psychiatrists, and change of venue. In contrast to the circumstances of *Brown* v. *Craven*, (9th Cir. 1970) 424 F.2d 1166, upon which appellant relies, the conflict between appellant and counsel had not caused a breakdown in communications. At the time the trial court denied appellant's request for substitute counsel, there was active give and take between appellant and counsel, and counsel's refusal to abandon the insanity defense in favor of the alibi defense was not indicative of ineffective representation of their client.

At the trial, counsel presented only the defense of insanity. While they had filed a timely alibi notice, they called no alibi witnesses. Appellant argues that his counsel were ineffective also because they failed to properly prepare for and present an alibi defense.

The record before us does not serve to overcome the presumption that counsel adequately investigated appellant's alibi defense. It does suggest that counsel may have waited to locate alibi witnesses until August, 1973, ten months after the crime and only two months prior to the trial. In August,

appellant's local counsel asked appellant to prepare for him a list of proposed alibi witnesses. Sometime before September 10th, appellant sent him the list. Since the list included incomplete mailing addresses and no telephone numbers, and identified several of the witnesses only by forename or nickname, counsel contacted appellant's family and asked their assistance in identifying and locating the witnesses. In addition, counsel sought and obtained authority from the court to hire an investigator at public expense to assist the defense. He filed an alibi notice in conformity with the statute. Appellant did not specify how each witness could support his alibi, nor did he ever identify his whereabouts at the time of the crime other than to state, in his alibi notice, that he was in LaPorte, Indiana. If appellant had presented a record which established definitely the failure of counsel to investigate appellant's alibi earlier, still that failure clearly would not estabish that counsel's investigation of the alibi defense was so grossly inadequate as to constitute ineffective representation.

Counsel's decision to pursue only the defense of insanity at trial likewise does not overcome the presumption of effective representation. The record does not support appellant's contention that the conflict between appellant and counsel or lack of trust dictated counsel's choice of defenses. The record indicates that counsel may have decided to depend on the insanity defense instead of the alibi defense as late as that point in the trial when the State rested its case-in-chief. While we do not know the degree to which appellant participated in the choice of trial strategy, we do know that cogent reasons supported the choice and counsel appear to have made it deliberately. The State's case was very strong. Two accomplices had testified and identified appellant as committing the offenses. The jury had heard appellant's confession in which he admitted that he had participated in the robbery and had been holding the shotgun at the time it discharged and killed the victim. A State Police officer had testified that forty

minutes prior to the robbery-homicide, he had stopped the car in which appellant was riding, talked to the men, and examined appellant's license. Under these circumstances, we cannot adjudge defense counsel ineffective because they produced no alibi defense. On the other hand, counsel did present witnesses who testified to appellant's being a mental patient in Norman Beatty Hospital for several years and psychiatrists who testified that appellant suffered from severe mental deficiencies. Counsel reasonably could have chosen to rely on a defense of insanity.

Appellant argues also that a court may not refuse to grant a defendant new counsel, in a situation where a rich man would hire new counsel. In his brief, appellant states:

> "The fact that the defendant is an indigent should not and must not have a bearing with respect to his right to effective assistance of counsel. If a wealthy man can replace counsel when there has been a breakdown of trust and confidence in the relationship between the client and attorney, then so should a poor person enjoy the same prerogative."

At the stage in which appellant requested new counsel, two judicial decisions were involved: appointment of new counsel and a continuance. We begin by noting that incompetent representation is ground for a new trial for either a rich or a poor man. We note also that the trial court may refuse to allow either the rich or the poor man to replace his counsel during or immediately before trial, because such a substitution would require the court to grant a continuance. *U.S.* v. *Maxey,* (2nd Cir. 1974) 498 F.2d 474; *U.S.* v. *Hampton,* (7th Cir. 1972) 457 F.2d 299, *cert den'd,* 409 U.S. 856; *U.S.* v. *Cozzi,* (7th Cir. 1965) 354 F.2d 637; *U.S.* v. *Mitchell* (2nd Cir. 1943) 137 F.2d 1006, adhered to 138 F.2d 831, *cert. den'd,* 321 U.S. 794. We cannot conceive of a situation in Indiana where the court would grant a continuance in order to allow a defendant to hire substitute counsel, but would not grant a continuance to have new coun-

sel appointed. Contrast *People* v. *Williams,* (1972) 386 Mich. 565, 194 N.W.2d 337.

However, in the earlier stages of trial preparation, the indigent defendant does have less control over the decision to substitute counsel than does the defendant who can afford to hire his own counsel. We do not believe that this is a denial of equal protection. We recognize that the State could not provide each indigent or middle income defendant with the same number of attorneys, investigators, and experts as a rich man might decide to employ. A wealthy person may hire any number of people to aid in his defense, needlessly, or on a whim, or foolishly, and the State does not control his expenditures. But, when the court is allocating state funds for the defense of a defendant, it is rational for the court to use discretion in granting or denying the defendant's requests for additional personnel to aid him. Within the primary goal of the judicial process, which is due process of law for each defendant, the court may determine which expenses are probably needless, wasteful, or extravagant.

In the case on appeal, we do not believe that the trial court would have granted a continuance to hire a lawyer either, since the defendant had been indicted eleven months before the request. The trial court had granted appellant's motions for local counsel, a medical expert, and a private investigator to be hired at public expense. This record indicates a willingness to grant appellant some of the assistance which a rich man could afford. This defendant was not denied the equal protection of the law.

## II.

Appellant's second ground for appeal is that the court erred in admitting into evidence a statement he made to the police on Saturday, November 11, 1972, from 9:30 a.m. to 11:07 a.m. In that statement, he admitted his part in the robbery and homicide, admitted that he was holding the gun,

but stated that his finger was behind the trigger at all times, so that the gun must have gone off accidentally. Appellant filed a motion to suppress the statement on December 19th. After a full hearing on January 11, 1973, in the St. Joseph Circuit Court, that court overruled the motion. At the trial in the Marshall Circuit Court, in October, 1973, appellant objected to the introduction of this statement, and that court conducted a hearing outside the presence of the jury and ruled the statement admissible.

On appeal, appellant challenges both the pre-trial ruling upon his motion to suppress and the overruling of his in-trial objection. While appellant does not state in his brief that he is challenging the correctness of the pre-trial ruling, he raises issues for our review which were raised and determined solely at the pre-trial hearing. Appellant has presented this Court with a record of proceedings containing a transcript of the in-trial hearing, but has not presented us with a transcript of the pre-trial hearing. In order that we may give full review to the resolution of appellant's constitutional claims made at the pre-trial stage, we ordered the St. Joseph Circuit Court to certify to us a transcript of that hearing, and it is now before us. Ind. R. Ap. P. 7.2(B).

THE PRE-TRIAL RULING:

We first consider appellant's challenge to the pre-trial denial of his motion to suppress. Appellant's motion asked the court to find his statement to be the product of coercion, because of his prolonged incommunicado detention, his fatigue and nervousness, and his deep emotional state, and also because of the failure to advise him of his *Miranda* rights or to advise him that he was being investigated. At the hearing, there was no evidence of mental or physical condition, and appellant admitted advisement of his rights and, an hour after his arrest, advisement of his crime. However, the witnesses presented other evidence relevant to voluntariness. Indiana requires the State to prove beyond

a reasonable doubt that the confession was voluntary. *Burton* v. *State,* (1973) 260 Ind. 94, 292 N.E.2d 790. (Contrast the preponderance standard in the Federal courts. *Lego* v. *Twomey,* (1972) 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618.)

The record of the pre-trial hearing discloses that an adequate advisement of rights was given appellant as required by *Miranda* v. *Arizona,* (1966) 384 U.S. 436, 88 S.Ct. 1602, 16 L.Ed.2d 694, and that he signed a written waiver at 9:10 a.m., November 11th. The statement which appellant seeks to suppress followed immediately. In cases such as this, wherein the adequacy of the advisement of rights is not in dispute, and the defendant's statement immediately follows a formal waiver of rights, the general claim that the statement was not voluntarily made and therefore inadmissible, carries with it the issue of whether or not the waiver was voluntarily and intelligently made. All of appellant's arguments would serve equally well to demonstrate that the State failed in its burden to show the waiver was voluntary and intelligent, as they would to demonstrate the State's failure to show that the confession was voluntary. As we said in *Nacoff* v. *State,* (1971) 256 Ind. 97, 267 N.E.2d 165:

> "A heavy burden rests on the [State] to demonstrate that the appellant intelligently and voluntarily waived his right to remain silent and to consult with appointed counsel. *Miranda* v. *Arizona, supra.* The legal standard to be applied in determining whether an accused, who has been properly advised of his rights and has signed a waiver, has voluntarily waived his rights is the same as that used in the pre-*Miranda* coerced confession cases. The question is whether, looking at all the circumstances, the confession was free and voluntary, and not induced by any violence, threats, promises, or other improper influence." 256 Ind. at 100-01.

Similarly, in *Brady* v. *U.S.,* (1970) 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747, the Supreme Court stated with regard to the guilty plea:

> "Waivers of constitutional rights not only must be voluntary, but must be knowing, intelligent acts done with

sufficient awareness of the relevant circumstances and likely consequences." 397 U.S. at 748.

If the waiver was not voluntarily and intelligently given, there was no voluntary and intelligent relinquishment of the rights to remain silent and to have counsel present during questioning, and, in that event, the statement would not be admissible. If the waiver is shown to have been voluntary and intelligent, any statement given to the police immediately following such waiver could not but be voluntary.

In the present case, we will review the trial court's determination of voluntariness with regard to the "totality of the circumstances." We will consider the evidence which supports the decision of the trier of fact in the case of contested evidence, and any uncontested evidence presented by the appellant. *Haynes* v. *Washington,* (1963) 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513; *Culombe* v. *Connecticut,* (1961) 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037; *Gallegos* v. *Nebraska,* (1951) 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86.

Appellant was arrested in LaPorte about 6:45 p.m., November 9, 1972, approximately fifteen hours after the homicide. The LaPorte police held appellant at their station for about an hour, until the South Bend police arrived. After ten minutes, they took appellant and an accomplice, Terry Jones, to South Bend, via appellant's LaPorte apartment. Pursuant to a search warrant, they searched the apartment and found a shotgun and shells. They arrived in South Bend about 9:00 p.m. Appellant was held in the St. Joseph County jail for about twenty-four hours before he announced his unprompted decision to make a statement to F.B.I. Agent Quigley, whom he had known before his arrest. This period was comprised of Thursday night and all day Friday.

Sometime Friday evening, appellant asked Officer Carr, who was in charge of the jail from 6:00 p.m., November 10th to 6:00 a.m., November 11th, to arrange a meeting with South

Bend Detective Gerschoffer and F.B.I. Agent Quigley so that he could talk to them. When Carr phoned and learned that Gerschoffer was not available, appellant said that he would talk to someone else, as long as Quigley was present. Carr made arrangements for a meeting on Saturday morning. That morning, appellant was advised of his rights and gave the statement the admissibility of which appellant contested at a pre-trial hearing, at trial, and now contests on appeal.

In support of his motion to suppress the confession, appellant described the conditions of his confinement. He said that he was in a one-man "holding" cell with no toilet tissue, soap or blankets. Carr stated that there was toilet tissue.

Appellant testified to harrassment by officers and citizens. In LaPorte, rookies going to a class upstairs in the police station pointed appellant out as "the killer." In South Bend, both officers and citizens woke him up talking about him as a killer, when there was no evidence. Because people were always coming in and talking about looking at "the maddog shotgun killer," he slept only an hour on the nights of November 9th and 10th. One officer woke him up to see his teeth. Officer Carr testified that, at least on the night of November 10th-11th, he had heard no officer speak to appellant and that he would have heard any conversation, as long as he was sitting at the booking desk where he was stationed. However, he also stated that appellant's cell was only seven or eight feet from the booking desk and that police officers and their prisoners would come to the booking desk and walk down the hall past appellant's cell all during the night.

Appellant testified that South Bend officers intimidated him. When his counsel pressed him for details, he said that he was told that they would take his younger brother and sister from his parents if he did not talk. Other evidence of threats was an officer's waking him to ask him how far he would jump if the officer shot him with a shotgun. Also, officers, after advising him of his rights, told him that they would bust his head if he did not talk.

On cross-examination, the prosecutor asked appellant, who had told him of the threat to his parents. Appellant testified that his parents had told him. But, when the prosecutor noted that appellant had testified earlier that he did not talk with his parents until a Sunday two or three weeks after his arrest, appellant then testified that Gerschoffer had told him of the threat on November 10th.

On the subject of the advisement of his rights, appellant testified that he was advised on November 9th in LaPorte by Captain Benninghoff of the South Bend Police Department. He testified that no one in LaPorte talked to him about the crime. Captain Benninghoff testified that he asked appellant if he had been advised of his rights when Benninghoff arrived in LaPorte. Appellant said that he had been advised, and Benninghoff readvised him. Appellant testified also that, in South Bend, when Detective Molnar asked him for a statement on November 9th, Molnar advised him of his rights. Finally, appellant testified that he had read and signed the waiver of rights form on the morning of November 11th before he made the statement.

With regard to his waiver of his right to an attorney before his decision to make a statement on November 10th, appellant stated that he had requested and been denied an attorney in both LaPorte and South Bend on November 9th. He testified that he did not request an attorney at any time after the 9th.

In LaPorte, appellant testified, he had requested Pat Smith, who was his parents' attorney (and, at the time of this pretrial hearing, the attorney for Terry Jones). From his testimony, it was unclear whether he asked the police to call Smith (he stated that they never called him) or he asked to call Smith himself (he stated that he was not allowed to call Smith).

In South Bend, appellant testified, he had told Detective Molnar that he wanted an attorney. Appellant said that he

was told, though not by Molnar, that he would have to get the captain to approve a phone call. He also said that he was told he could contact only the detective bureau or the State's attorney.

In rebuttal, Captain Benninghoff testified that he and Molnar picked appellant up in LaPorte. When Benninghoff arrived in LaPorte, appellant was talking with LaPorte Police Officer Christian. Appellant was saying that he was not going to admit anything, because there might be an error at trial and he could beat it that way. Benningoff asked him if he had been informed of his rights and informed him again of his rights, including the right to an attorney. Appellant replied that he had been informed and knew all about that. At this point, it would have been natural for appellant to tell Benninghoff that he had asked to call attorney Pat Smith during the hour since his arrest and that his request had been denied. His failure to do so casts doubt on his testimony concerning his request in LaPorte. Further, appellant was in LaPorte for only an hour, and appellant testified that the officers did not talk to him except to tell him that he had killed someone. No officers from LaPorte testified at the hearing.

Benninghoff and Molnar drove appellant and Terry Jones to South Bend. Benninghoff told appellant and Jones not to talk during the trip. Both Benninghoff and Molnar testified that appellant never requested an attorney in their presence. On the basis of the testimony, the St. Joseph Court could have found that appellant's testimony about his two requests on November 9th was not credible. Appellant's own testimony and that of the State's witnesses put into question appellant's request in LaPorte and contradicted his assertions concerning his request in South Bend.

Appellant testified that the only reason he made the statement was because he had been told that his younger brother and sister would be taken from his parents if he did not cooperate. However, the prosecutor impeached appellant in part in regard to this alleged threat, and appellant then ad-

mitted that he had made the statement also because he knew that his accomplices had made statements which placed all the blame on him. On cross-examination, appellant admitted that he did not make the security of his family the condition for his statement, but rather insisted on the presence of Agent Quigley. Also, appellant knew that the officers had found a shotgun in his apartment.

At this pre-trial hearing, neither appellant nor any witness for the State introduced any evidence concerning appellant's mental health or his mental state during the twenty-four hours between his arrest and his decision to make a statement.

Based on appellant's testimony and the testimony of the State's witnesses, the court did not err in finding, beyond a reasonable doubt, that appellant's waiver of rights and subsequent statement were made voluntarily. At the time appellant announced his desire to make a statement, he knew that his accomplices had made incriminating statements. *Lisenba* v. *California*, (1941) 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166; *Thompson* v. *State*, (1971) 256 Ind. 48, 267 N.E.2d 49. He had accompanied the police to his home where they found the shotgun and shells. He knew that he had been arrested for the robbery-homicide at the service station. He asked to talk about the crime in the presence of Agent Quigley, whom he had known personally before his arrest. *Stein* v. *New York*, (1953) 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522. In his statement, he narrated the circumstances of the crime in detail, rather than merely answering leading questions. Contrast *Spano* v. *New York*, (1959) 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265. Three times he stated that his finger was behind the trigger, so that the gun must have gone off accidentally. It is reasonable to believe that appellant intended that his statement agree with those of his accomplices, but include this exculpatory explanation. *Lisenba* v. *California*, *supra* at 233-34. Appellant was orally advised of his *Miranda* rights and signed the waiver form after reading it. Contrast *Dickerson* v. *State*, (1972) 257 Ind. 562, 276 N.E.2d 845.

With consideration for all the circumstances, we affirm the finding of the court made at the pre-trial stage that appellant knowingly and intelligently waived his rights to remain silent and to have an attorney present and that he made his statement voluntarily.

THE IN-TRIAL RULING:

We next review the trial court's overruling of appellant's objection to the admission of the same incriminating statement.

The procedure for challenging the admissibility of a confession on constitutional or statutory grounds has in Indiana traditionally been the in-trial objection, with request for a hearing before the judge if needed to determine disputed factual matters. Until more recent years, this procedure was deemed exclusive in confession cases. *McGee* v. *State* and *Radford* v. *State,* (1951) 230 Ind. 423, 104 N.E.2d 726; *Kokenes* v. *State,* (1937) 213 Ind. 476, 13 N.E.2d 524. In spite of the condemnation in these cases of the use of the pre-trial motion to suppress with its separate pre-trial hearing and ruling, that procedure has now become widely used and accepted, as a discretionary alternative practice in our trial courts. The following cases of recent vintage demonstrate this fact: *Brown* v. *State,* (1971) 256 Ind. 558, 270 N.E.2d 751; *Mims* v. *State,* (1970) 255 Ind. 37, 262 N.E.2d 638; *Smith* v. *State,* (1969) 252 Ind. 425, 249 N.E.2d 493; *Dowlut* v. *State,* (1968) 250 Ind. 86, 235 N.E.2d 173. *See also,* 1 A.L.R.2d 1012.

The history of the use and development of the pre-trial motion to suppress in search and seizure cases has been different. There, the pre-trial mode of determining the admissibility of seized items has been a common non-exclusive practice for years. *Riddle* v. *State,* (1971) 257 Ind. 501, 275 N.E.2d 788; *Shuck* v. *State,* (1944) 223 Ind. 155, 59 N.E.2d 124; *Kokenes* v. *State, supra.* At present, suppression hearings are being held in the pre-trial period in both confession and search and

seizure cases. We consider the procedure to be properly used in confession cases in the discretion of the trial court. The pre-trial consideration of the admissibility of a confession likely to be used by the State would appear to have statutory sanction in that part of the new statutes governing criminal procedures which authorizes omnibus hearings and pre-trial conferences. Ind. Code § 35-4.1-3-1, being Burns § 9-1201. It, of course, remains entirely proper to consider a motion to suppress or an objection at trial, at the time the challenged statement is offered.

In light of the growing use of the pre-trial motion to suppress in confession cases, it is deemed appropriate to set forth some guidance for the trial judge who is faced with a trial objection to a confession previously determined to be admissible. As a backdrop to proper consideration of this matter, it should be kept in mind that, in these situations, the State has already successfully met the issues raised in the challenge and shown beyond a reasonable doubt the voluntariness of the waiver and statement. When a simple objection for the purpose of preserving appellate rights is made, the trial judge should consider the pre-trial determination *res judicata* and binding upon him and overrule the objection. If, however, the trial objection is based upon new factual or legal matter, a simple overruling of the objection would not be appropriate. In that instance, the trial judge may expect, and indeed require, that he be provided with an accurate summary description of such new matter. Thereafter, either of two levels of judicial response is appropriate. The trial judge may summarily overrule the objection if the new matter could in no event result in a determination of inadmissibility. This summary disposition may be made upon consideration of counsel's description, or, in the discretion of the judge, after having permitted the defense to call witnesses, to present its new matter. On the other hand, if the trial judge deems such new matter to be of sufficient substance, he may conduct a hearing on the motion to suppress, having a scope

appropriate under the circumstances, and reconsider the issue of admissibility. *Gasaway* v. *State*, (1967) 249 Ind. 241, 231 N.E.2d 513. In *Rouse* v. *U.S.*, (D.C.Cir. 1966) 359 F.2d 1014, the D.C. Court of Appeals identified the nature of new matter which would call for a further hearing, as matter first appearing at trial which casts "reasonable doubt on the pre-trial ruling."

Where, as in the case at bar, the judge who conducts the trial is not the judge who conducted and determined the pre-trial motion, obstacles to a full and fair reconsideration at trial exist. The trial judge is not acquainted with the evidence presented in the pre-trial hearing. Consequently, he is unable to weigh the old evidence with the new. This problem does not arise, of course, where the trial judge makes a summary denial of the objection based upon an inadequate showing of substantial new matter. Neither does the problem arise when the new matter would provide an independent and sufficient ground for suppression, as in the case at bar. The problem would exist, where the trial judge deemed it appropriate to reopen an issue litigated and finally determined at the pre-trial stage, for, in such instances, re-weighing of the new and old evidence as a body would be required. In such extreme cases, re-litigation of the motion to suppress is indicated. A transcript of the pre-trial hearing may or may not be used in such re-litigation, depending upon, for instance, whether the credibility of a single witness or existence of a single fact is undermined by the new matter. In such cases, the balance of the transcript, unrelated to that witness or that fact, might well serve in lieu of the live testimony of the State's suppression witnesses.

In the case at bar, defense counsel's in-trial objection to the admission of appellant's statement was:

"Well, our objection to the statement, your honor—I will put it as directly as I can and then your honor can make his ruling, is that this defendant was not competent at the time he made the statement to knowingly waive his constitutional rights."

The prosecutor objected to holding a hearing on the objection on the ground that the issue had been heard and determined adversely to the defendant in the St. Joseph Circuit Court. This objection was withdrawn, and a hearing was held before the Marshall Circuit Court outside the presence of the jury. Appellant presented only his own testimony. The State called only Agent Quigley.

Appellant testified that, at the time of the homicide, he was twenty-four years old. He had been in the ninth grade when he quit school. He had spent three to four years in Beatty Memorial Hospital as an adolescent. From November, 1967 to May, 1972, he was in the penitentiary in Minard, Illinois. While he was there, he took the high school equivalency test and received his diploma. He also took a course as a medical technician. He knows four foreign languages.

In regard to the conditions of his confinement, he stated that his cell had had only a steel bunk, a sink and a toilet. Toilet tissue was provided, but there was no blanket, mattress or toilet articles. Appellant was not permitted to shower or shave. At the time he was wearing only a pair of coveralls and shoes. He was awakened constantly by officers who reached through the bars and shook his feet. Several officers told him that they had gone to school with the victim. Appellant alluded to a threat made by an officer named Keith Forsythe in the following vague answer:

"Q. Any other items which you consider duress? Did anything else take place prior to making a statement which you consider duress?
A. Yes, which would be hearsay entirely on my part but there was some officer, etc. that mentioned they would like to shoot me and see how far I would jump."

Appellant admitted that he was not physically abused but testified that he had been unable to sleep and was exhausted when he made the statement. At this hearing, he testified that the reason he gave the statement was in order to get out of the holding cell, since he had learned that his accomplices

who had made statements against him were transferred to the second floor immediately.

Appellant's testimony established the fact that no officer questioned him until he decided to make a statement. Quigley testified that appellant was treated fairly, without any physical or mental pressures being put on him at the time he gave the statement. Appellant spoke cordially and was alert and cooperative. He made no complaints to Quigley that he had been unable to sleep or had been denied access to an attorney. The State included in the record the fact that Friday, the day following appellant's arrest, was Veterans' Day, followed by the weekend, and that he was taken to court on Monday.

Clearly, appellant was repeating his contentions, previously made at the pre-trial hearing, that prior to making the statement he had been without sleep, harassed and threatened, and denied counsel upon request. Counsel replayed this testimony of allegedly coercive police tactics, so that the trial judge could consider their impact upon the appellant's allegedly diseased or defective mind. The issue of competency to waive his rights raised by this in-trial objection was intended as an independent and sufficient ground for challenging the written waiver of rights signed by appellant. It was so litigated.

Appellant posits that the spartan surroundings in the holding cell, experienced over a period of about twenty-four hours and the delay in presentment to a magistrate, coupled with his history of mental illness, should have created in the mind of the judge a reasonable doubt as to the admissibility of this confession. Even though these matters are uncontradicted in the record, we do not consider them to have been of sufficient import to have rendered his waiver involuntary. Appellant was twenty-four years old, an eighth grade graduate, and of above average intelligence. He had been convicted of a crime before, so that he had some experience with the police. Quite obviously, appellant's testimony that he had been confined in a mental hospital during puberty establishes no mental disease

or incompetence which the alleged coercive police tactics might have exacerbated. Nothing in his testimony indicates that he was mentally disturbed in such a way as to be easily convinced by others, overwhelmed by unfamiliar surroundings, or afraid of persons in authority. Contrast *Culombe* v. *Connecticut, supra* at 625; *Fikes* v. *Alabama,* (1957) 352 U.S. 191, 193, 77 S.Ct. 281, 1 L.Ed.2d 246; *McNabb* v. *U.S.,* (1943) 318 U.S. 332, 334-35, 63 S.Ct. 608, 87 L.Ed. 819; *Chambers* v. *Florida,* (1940) 309 U.S. 227, 238-40, 60 S.Ct. 472, 84 L.Ed. 716; *Robbins* v. *State,* (1968) 250 Ind. 219, 235 N.E.2d 199. Appellant had lived away from home in institutional environments for seven or eight years. The idea of being alone in strange or hostile surroundings would not have been so frightening or confusing as to undo his will. The testimony of appellant himself indicated that he was intellectually capable of understanding his constitutional rights and probably not so mentally disoriented as to act contrary to his will at the time of the confession. In addition, Quigley testified that appellant behaved normally and was alert during the questioning. At this hearing, appellant presented no evidence of any threat to harm his family. Contrast *Haynes* v. *Washington, supra; Rogers* v. *Richmond,* (1961) 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760; *Hall* v. *State,* (1971) 255 Ind. 606, 266 N.E.2d 16. After hearing the witnesses present this new matter, the trial court correctly decided at this point in the trial that the State had carried its burden of showing the waiver of rights to have been voluntarily and knowingly made, as against this challenge.

In his brief, appellant points to the testimony which the psychiatrist gave on the issue of insanity and argues that we should consider their testimony also in determining whether the trial judge erroneously admitted the statement. We decline to do so. Their testimony does not stand undisputed on the record. *Davis* v. *North Carolina,* (1966) 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; *Haynes* v. *Washington, supra.* Moreover, it was presented long after the pre-trial and in-trial

rulings on the admissibility of the statement. At trial, counsel made no motion to reconsider these rulings in light of the testimony of the psychiatrists, and, in the absence of such a motion, the testimony is not pertinent on appeal to a review of a judge's ruling on admissibility. Such evidence was for the jury.

## III.

Appellant argues that the trial court erred in admitting into evidence Exhibits Nos. 2 and 3, plastic wadding and metal pellets taken from the chest of the victim in the autopsy; No. 4, an X-ray of the victim's chest; and No. 15, a book of matches with the Clark Motor Oil emblem on the cover.

With regard to the wadding and pellets, appellant objected that the chain of custody was not complete. The doctor who performed the autopsy gave the items to Detective Coffman, who was present at the autopsy. Coffman scratched his initials into the plastic of the wadding, put the wadding and pellets into vials, and marked the vials for evidence. He turned the vials over to the property room at the South Bend Police Department. A month later, Detective Molnar took the vials out of the property room, sent them via United Air Lines to the Federal Bureau of Investigation, received them from the F.B.I., and returned them to the property room. We agree with appellant that the chain is not complete.

In *Graham* v. *State*, (1970) 253 Ind. 525, 255 N.E.2d 652, this Court noted that there must be a foundation connecting the evidence to the crime before the evidence will be admissible at trial. In instances where the evidence has been handled by several different people, the State must establish a complete chain of custody tracing the original evidence to the final custodian. "If one link of the chain is entirely missing, the exhibit cannot be introduced or made the basis for the testimony or the report of an expert or officer." 253 Ind. at 530.

In this case, without either the records of the police department property room showing the disposition of the vials at

all times or the testimony of the captain who controlled access to the property room, the court could not know whether anyone besides Molnar removed the exhibits from the room in the months they were in police custody. It is especially important for the court to know whether the vials were removed from the room in the month before Molnar sent them to the F.B.I. for analysis. The court in *Graham* noted that the State's burden was not great. If the State produced police record books showing the location of the exhibit at all times, with testimony to explain the disposition of the exhibit at any point where the records were silent or unclear, this would suffice.

No test results relating to the wadding or pellets were introduced. They were only illustrations of the doctor's testimony. As such, they were cumulative evidence concerning the weapon which caused the victim's death. Appellant did not object to the testimony of either the doctor or the detectives about the weapon. In this case, the identity of the exhibits was relatively unimportant, and the admission of the exhibits was harmless error.

At trial, appellant objected also to the admission of an X-ray of the victim's chest, on the ground that it was immaterial. Counsel for the State replied showing the relevancy of the X-ray. In his motion to correct errors, appellant argued that the X-ray was not properly authenticated. On appeal, he objects because the subject matter of the X-ray was not identified by either the person taking the X-ray or a person observing the whole process.

At trial, the doctor testified that he had taken X-rays for evidence, that he had brought this particular X-ray into court himself, that it was his, and that it showed the chest of the victim on the day of the autopsy. These statements imply that the doctor took this particular X-ray, and since appellant failed to clarify his objection at trial, we must find that he has waived that objection. Again, the X-ray was only illustra-

tive of the doctor's testimony and cumulative on the issue of physical cause of death.

Finally, appellant objects to the admission of the book of matches with the Clark Motor Oil emblem on the cover, on the grounds that it is irrelevant and that it is substantially more prejudicial than probative. Detective Molnar testified that he found the matchbook in the car which appellant had borrowed from his neighbor on the night of the homicide, that it was a full book, and that it was in the car when he searched it on the evening of the homicide, November 9th.

Appellant objects because there are many Clark stations in Indiana, including one in LaPorte in the neighborhood of appellant and the owner of the car. We agree with the trial court that this objection goes to the weight of the evidence, not to its admissibility. The exhibit was admissible because the presence of the matchbook in the car which appellant had borrowed and in which an officer had seen him riding early in the morning of November 9th, made it slightly more probable that he stopped at the South Bend Clark station. The fact that a piece of evidence makes an inference slightly more probable suffices to show its relevance. *Thomas* v. *State,* (1968) 251 Ind. 76, 238 N.E.2d 20; McCormick, EVIDENCE § 185. The evidence was "prejudicial" only insofar as it made the desired inference more probable. The court did not err in admitting the matchbook into evidence. We affirm the judgment of the trial court.

Hunter and Prentice, JJ., concur; Arterburn, J., concurs in result and dissents in part with opinion in which Givan, C.J., concurs.

OPINION CONCURRING IN RESULT, DISSENTING IN PART

ARTERBURN, J.—I concur in the result reached in this case, but not the language therein which states that the State must prove beyond a reasonable doubt that a confession was voluntary in the collateral hearing before the judge to determine the admissibility of the confession.

The trial judge's preliminary hearing on admissibility in such a case does not go to the guilt or innocence of the defendant. Therefore, the standard that the evidence must prove beyond a reasonable doubt that the confession was voluntary is not applicable, but only one of a preponderance of the evidence. It is when the evidence of the confession is submitted to the jury and the jury determines its credibility that the State must prove beyond a reasonable doubt that the confession was voluntary.

I realize that previously in *Burton* v. *State*, (1973) 260 Ind. 94, 292 N.E.2d 790, Justice Hunter speaking for this Court said the State on the issue of admissibility has a "heavy burden" to prove beyond a reasonable doubt that the confession was given voluntarily. Of course, this is true in the trial before the jury, but in my opinion, this has no application to a collateral issue of admissibility heard by the trial judge. In this reasoning I am supported by the recent United States Supreme Court case of *Lego* v. *Twomey*, (1972) 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618, which has held that the standard for the judge to determine the voluntariness of a confession for admissibility is not the same standard a jury uses for conviction. The judge merely determines the voluntariness by a preponderance of the evidence. There is no issue of guilt or innocence involved in the hearing before the trial judge on the issue of voluntariness. Therefore, proof beyond a reasonable doubt has no application. When the issue goes to the jury, of course, the proof must be beyond a reasonable doubt before a conviction can be supported.

Givan, C.J., concurs.

NOTE.—Reported at 335 N.E.2d 811.