Billie Ray ADAMS, Appellant,

v.

STATE of Indiana, Appellee.

No. 580S129.

Supreme Court of Indiana.

Jan. 26, 1982.

Harriette Bailey Conn, Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Palmer K. Ward, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Chief Justice.

On October 10, 1972, appellant was sentenced to life imprisonment, having been convicted on a two-count indictment of the offense of murder. A co-defendant and alleged accomplice was also convicted of the same charge. *See, Adams v. State*, (1974)

262 Ind. 220, 314 N.E.2d 53. Subsequently appellant filed his petition for post-conviction relief in Allen Circuit Court. This is an appeal from an adverse decision on that petition.

Appellant first claims the trial court erred in granting the State's motion to strike that part of appellant's petition referring to certain errors that allegedly occurred during appellant's trial. The post-conviction judge stated in his findings of fact, "[T]he allegations in these paragraphs were stricken for the reason that said issues so raised had been adjudicated by the Supreme Court of Indiana in *Adams v. State*, 262 Ind. 220, 314 N.E.2d 53." ·

 An examination of appellant's petition shows, as the court observed, all stricken portions are among the errors alleged by the appellant in his Motion to Correct Errors filed after the original trial. All these allegations of error were treated by this Court in the direct appeal and were decided adversely to appellant. Issues raised and determined on direct appeal are not reviewable in a post-conviction proceeding. *Kennedy v. State*, (1979) Ind., 393 N.E.2d 139; *Eliacin v. State*, (1978) 269 Ind. 305, 380 N.E.2d 548; *Frasier v. State*, (1977) 267 Ind. 24, 366 N.E.2d 1166; Ind.R.P.C. 1, § 8. The trial court did not err in granting the State's motion to strike those parts of the petition.

Appellant contends these issues form the underlying basis for his further allegations of inadequate representation by counsel, newly discovered evidence, and the State's failure to disclose exculpatory evidence.

This Court has held the proper test of adequacy of representation by counsel, taking a totality of the circumstances approach, is the "mockery of justice" standard, as modified by the "adequate legal representation" standard. *Hollon v. State*, (1980) Ind., 398 N.E.2d 1273; *Line v. State*, (1979) Ind., 397 N.E.2d 975; *Crisp v. State*, (1979) Ind., 394 N.E.2d 115. The record in this case shows the conduct of a vigorous defense rather than a lack of knowledge or understanding of the law on the part of counsel. (See the original appeal of appellant's conviction, *Adams v. State, supra*.)

Appellant claims he must use the errors committed at his trial as a basis for his post-conviction remedy arguments concerning newly discovered evidence and the State's failure to disclose exculpatory evidence. We do not agree. Appellant is quite able to make his arguments regarding newly discovered evidence or the State's failure to disclose exculpatory evidence without reference to the trial court's alleged erroneous rulings.

Appellant claims the trial court erred in concluding appellant did not meet his burden of proof as to newly discovered evidence. The newly discovered evidence offered at the post-conviction proceeding was testimony from Viola Richards, appellant's landlady who lived next door to appellant at the time of the crime, and Paula Vails, appellant's girlfriend at the time of the robbery. Mrs. Richards testified she saw the co-defendant and another man, Jim Taylor, who was also a witness at the trial, exchange guns on the front porch of appellant's home a few days before the crime. She also testified on the day of the robbery she saw Taylor and the co-defendant leave appellant's home (the co-defendant roomed with appellant at the time) at about 10:30 A.M. on the day of the crime. The crime occurred about 11:00 A.M. Mrs. Richards testified she gave appellant's counsel this information before the trial and though he said he would call her as a witness he never did.

Paula Vails testified appellant spent the night before the robbery with her at her home and did not leave the residence until about 11:00 A.M. that day in order to meet the co-defendant at a bar. She testified she gave appellant's attorney this information and though he told her he would call her as a witness at the trial he did not do so.

P.C.R. 1(a)(4) provides a claim for post-conviction relief may be premised on "evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice . . . ." In interpreting this part

of the rule, this Court has established several criteria that must be met before we will reverse the lower court's denial of the petition. Among these is the petitioner must establish the evidence has been discovered since the trial. *Clark v. State*, (1978) 269 Ind. 90, 378 N.E.2d 850; *Baker v. State*, (1976) 265 Ind. 411, 355 N.E.2d 251; *Torrence v. State*, (1975) 263 Ind. 202, 328 N.E.2d 214. In the case at bar in presenting his argument of incompetency of counsel, appellant asserts the attorney was aware of the existence of this evidence. He, therefore, cannot for purposes of this allegation deny that assertion.

■ In order to be successful in a post-conviction relief petition, it must be shown the newly discovered evidence will probably produce a different result on retrial. *Clark, supra; Baker, supra; Torrence, supra.* In making this determination the post-conviction court "should consider the weight which a reasonable trier of fact would give the proffered evidence and the probable impact of it in light of all the facts and circumstances shown at the original trial of the case." *Torrence, supra,* at 206, 328 N.E.2d at 217.

■ Given these guidelines, it is unlikely this evidence would produce a new result at retrial. The essence of the State's evidence against appellant was his confession of a role in the crime to several of his acquaintances who were called as witnesses at the trial. In fact, there was evidence at the post-conviction proceeding appellant made such an admission to Mrs. Richards, though she denied that. Mrs. Richards was subpoenaed to appear as a witness by the State but did not appear. Her testimony does nothing to contradict the evidence that appellant confessed to the crime to several others and does nothing to establish appellant's whereabouts at the time of the crime.

Thus, the post-conviction court had two bases for holding appellant failed to meet his burden of proof with respect to the newly discovered evidence argument: (1) the evidence was not newly discovered; and (2) on retrial it would not be likely to produce a different result. The trial court did not err concerning the "newly discovered evidence."

Appellant next claims the trial court erred in denying relief on his allegation that his representation by counsel was inadequate. Appellant claims there was insufficient contact between he and his attorney prior to trial; that his attorney failed to call Viola Richards and Paula Vails as witnesses; that he failed to interview witness Jim Taylor prior to trial; that he refused to allow appellant to testify; failed to disclose witness Royce Richey's "mental condition"; and failed to talk to the co-defendant.

■ The rule applied in determining adequacy of representation has been set forth earlier in this opinion. *See, Hollon, supra; Line, supra; Crisp, supra.* There is a strong presumption of the effectiveness of counsel that is overcome only by the presentation of convincing evidence to the contrary. *Id.*

Appellant and members of his family and acquaintances testified repeatedly they had trouble getting in touch with the attorney. Appellant stated he met with the attorney only twice prior to trial and that one of those times was on the first morning of the trial itself. On the other hand, the attorney for the co-defendant testified he worked closely with appellant's attorney and knew the attorney visited Fort Wayne and talked with appellant at least six times after appellant was transferred to the jail there. Also, a Marion County sheriff produced records indicating the attorney visited appellant three times while he was still incarcerated there.

■ In post-conviction proceedings, the judge is the sole judge of the weight of the evidence and the credibility of witnesses. His decision is to be reversed only where the evidence is without conflict and leads unerringly to a result not reached by the trial court. *Dobeski v. State*, (1981) Ind., 419 N.E.2d 753; *Lagenour v. State*, (1980) Ind., 414 N.E.2d 295; *Laird v. State*, (1979) Ind., 385 N.E.2d 452. It is apparent the post-conviction judge chose to believe one set of witnesses and not the other. It is

within his discretion to do so. We will not reverse that decision.

As to the allegation of failure to obtain separate trials, we note the evidence as to whether such a request was ever made is in conflict. Appellant testified he made such a request; however, the co-defendant's attorney testified no such request was ever made. The rule cited above applies. The trial court's finding is supported by evidence and will not be distrubed by this Court.

■ The attorney's testimony also indicated the decision to move forward with joint rather than separate trials was a strategic one. We do not second-guess matters of trial strategy and tactics in evaluating an allegation of incompetence of counsel. *Line, supra; Keys v. State,* (1979) Ind., 390 N.E.2d 148.

As to the failure to call Viola Richards as a witness, the record shows the State had already subpoenaed her as a witness; however, she did not respond to that subpoena. Further, as above pointed out, the record demonstrates there was little or no value to the defendant as to Viola Richards's testimony.

As to Paula Vails, the co-defendant's attorney testified he had worked closely with appellant's attorney at all stages of the pretrial and trial proceedings and had never heard Paula Vails's name mentioned by anyone. Vails testified to the contrary to the effect she told appellant's attorney of the alibi she had for appellant. As we have previously noted it is within the post-conviction judge's discretion to weigh evidence and judge the credibility of witnesses. *Dobeski, supra; Lagenour, supra; Laird, supra.* Clearly a finding that appellant's counsel did not demonstrate incompetence by failing to call Vails as a witness is supported by the testimony in this case. The trial court did not err in this regard.

As to witness Taylor, appellant does not make it clear what effect a pretrial interview would have had on the trial. The record also shows a vigorous cross-examination of Taylor was conducted. There is nothing in this record to disclose what an interview of him prior to trial would have accomplished. As to the decision to allow the co-defendant to take the witness stand but to have defendant exercise his right not to testify was purely a matter of trial tactics agreed upon by the attorneys representing the defendants. There is no demonstration whatever of any incompetence involved in this decision.

As to witness, Royce Richey's, "mental condition" which appellant asserts should have been disclosed by his attorney, there is nothing in appellant's brief which provides us guidance as to what this alleged "mental condition" was. We, therefore, deem this argument waived under Rule 8.3(A)(7) of the Indiana Rules of Appellate Procedure.

■ We find the trial court was correct in its finding appellant failed to meet his burden of proof in overcoming the strong presumption of the adequacy of representation.

Other errors of counsel appellant asserts illustrate inadequacy of representation are deemed waived by appellant's failure to comply with Ind.R.App.P. 8.3(A)(7), which sets out the requirements for properly developing one's argument with respect to issues presented for review. Appellant fails to develop a discernible argument with respect to allegations counsel demonstrated incompetence with regard to a conflict of interest or that he did so by failing to challenge the credibility of a State's informant.

■ Appellant claims the trial court erred in finding he did not carry his burden of proof with respect to an alleged failure of the State to disclose exculpatory evidence, citing *United States v. Agurs,* (1976) 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342. The gist of appellant's allegation is the State had taken statements from Viola Richards that she had seen the co-defendant and Jim Taylor leaving appellant's house together at about 10:30 A.M. on the morning of the crime (which was committed at around 11:00 A.M.), and that the State failed to disclose these statements to appellant.

Appellant's argument on this point fails, as we do not see how this evidence is of such a nature as to fall within the rule. As we stated in *State v. Wright*, (1978) 267 Ind. 590, 593, 372 N.E.2d 453, 455, "[T]he ultimate issue is whether the prosecutor's omission is of *sufficient significance* to result in a denial of the defendant's right to a fair trial." (Emphasis in original.) This evidence does not meet the test. The Supreme Court stated in *Agurs, supra*; "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." 427 U.S. at 109–110, 96 S.Ct. at 2400, 49 L.Ed.2d at 353. The most that can be said here is Richards's testimony might have helped the defense by showing the co-defendant was with someone else half an hour before the robbery. Such testimony hardly excludes appellant from the scene of the robbery.

Further, it is hard to understand how appellant characterizes this as "undisclosed" evidence. Richards testified she spoke to appellant's attorney by telephone prior to trial and told him exactly the nature of the testimony she wished to offer. Thus, the evidence was in fact disclosed to appellant through his counsel. The State was under no obligation to disclose what appellant already knew.

The post-conviction court is in all things affirmed.

DeBRULER, PRENTICE and PIVARNIK, JJ., concur.

HUNTER, J., dissents with separate opinion.

HUNTER, Justice, dissenting.

I must respectfully dissent from the majority opinion. While I agree with the majority's general statement of the standard to be applied in counsel incompetency problems, I feel that the circumstances as shown by the record in this case demand a more thorough analysis of our standard. I further find that a thoughtful application of that standard to the facts here shows that defendant was denied his constitutional right to effective assistance of counsel and should be granted a new trial.

It is now well settled that a defendant's right to competent representation at trial is derived from two separate constitutional guarantees—the specific guarantee to the assistance of counsel found in the Sixth Amendment to the United States Constitution and Article 1, § 13 of our Indiana Constitution and the due process clause found in the Fourteenth Amendment of the United States Constitution. The due process guarantee has always been viewed as a concern for the fairness of the trial as a whole including the role played by counsel in the proceedings. The standard used for measuring the effectiveness of counsel in this context has traditionally been the "farce" or "mockery of justice" test applied to the trial as a whole.

However, many jurisdictions have now specifically held that these due process standards are not sufficient to test the separate constitutional guarantee of assistance of counsel. "One may receive ineffective assistance of counsel even though the proceedings have not been a farce or mockery." *Herring v. Estelle*, (5th Cir. 1974) 491 F.2d 125, 128 (citation omitted). Although no single standard has been formulated to test the Sixth Amendment guarantee, the emphasis in the various standards employed has shifted from the rudiments of the trial to the quality of representation by counsel. The United States Supreme Court has said that counsel's performance must be within the "range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, (1970) 397 U.S. 759 at 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763, 773. The standards used most frequently are based upon the test of "reasonably competent assistance of counsel acting as a diligent conscientious advocate." *United States v. Moore*, (D.C.Cir.1976) 554 F.2d 1086, 1089. Other federal jurisdictions now use similar tests. *See: United States ex rel. Williams v. Twomey*, (7th Cir. 1975) 510 F.2d 634; *Gaines v. Hopper*, (5th Cir. 1978) 575 F.2d 1147; *Wilson v. Cowan*, (6th Cir. 1977) 578

F.2d 166; *United States ex rel. Johnson v. Johnson*, (3d Cir. 1976) 531 F.2d 169, *cert. den.* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823; *United States v. Elksnis*, (9th Cir. 1975) 528 F.2d 236; *Dunker v. Vinzant*, (1st Cir. 1974) 505 F.2d 503, *cert. den.* 421 U.S. 1003, 95 S.Ct. 2404, 44 L.Ed.2d 671; *United States v. Reincke*, (2d Cir. 1967) 383 F.2d 129; *Hickock v. Crouse*, (10th Cir. 1964) 334 F.2d 95, *cert. den.* 379 U.S. 982, 85 S.Ct. 689, 13 L.Ed.2d 572 (1965). Many states have also held that the farce and mockery of justice standard is no longer adequate to describe the quality of representation to which a defendant is constitutionally entitled. *Krummacher v. Gierloff*, (1981) 290 Or. 867, 627 P.2d 458; *People v. Pope*, (1979) 23 Cal.3d 412, 152 Cal.Rptr. 732, 590 P.2d 859; *People v. Blalock*, (1979) 197 Colo. 320, 592 P.2d 406; *Risher v. State*, (1974) Alas., 523 P.2d 421. *See also*, Annot: *Adequate Representation by Counsel*, 2 A.L.R. 4th 27.

This Court modified its traditional "mockery of justice" standard with the addition of the "adequate legal representation" requirement in *Thomas v. State*, (1969) 251 Ind. 546, 242 N.E.2d 919, and continues to espouse this standard. *Hollon v. State*, (1980) Ind., 398 N.E.2d 1273; *Smith v. State*, (1979) Ind., 396 N.E.2d 898; *Crisp v. State*, (1979) Ind., 394 N.E.2d 115; *Cottingham v. State*, (1978) 269 Ind. 261, 379 N.E.2d 984; *White v. State*, (1981) Ind. App., 414 N.E.2d 973; *Lyles v. State*, (1978) Ind.App., 382 N.E.2d 991. A true application of this standard demands a constitutional scrutiny of the *quality* of representation by counsel as well as of the rudiments of the trial.

Although the focus of our inquiry in assistance of counsel problems has been enlarged, several well-settled principles continue to apply. It is clear that the burden of proving a claim of inadequate assistance of counsel is on the defendant.

"Counsel is presumed to have prepared and executed his client's defense effectively. *State v. Irvin* (1973), 259 Ind. 610, 291 N.E.2d 70; *Robbins v. State* (1971), 257 Ind. 273, 274 N.E.2d 255. This pre-sumption is rationally grounded in the educational and other requirements for admission to the practice of law, but is rebuttable by strong and convincing proof. *Robbins v. State, supra.* In resolving the issue, a court should consider the totality of the circumstances surrounding counsel's pre-trial preparation and the actual conduct of the trial. *Lowe v. State* (1973) 260 Ind. 610, 298 N.E.2d 421; *Blackburn v. State* (1973) 260 Ind. 5, 291 N.E.2d 686; *Sargeant v. State* (1973) 157 Ind.App. 173, 299 N.E.2d 219." *Magley v. State*, (1975) 263 Ind. 618, 621, 335 N.E.2d 811, 814.

Furthermore, this Court does not try to judge the strategic choices made by trial counsel. Effective advocacy is displayed daily in trial courts by competent attorneys with widely differing approaches, styles, personalities, and strategic inclinations. But effective assistance of counsel does mean conscientious, meaningful representation considering all of the circumstances of the case. We have found that isolated poor strategy, bad tactics, a mistake, carelessness or inexperience does not necessarily amount to ineffective counsel. *Cottingham v. State, supra; Lowe v. State*, (1973) 260 Ind. 610, 298 N.E.2d 421. However, we have also found that the commission of only one error on the part of trial counsel can amount to ineffective assistance of counsel, where the counsel's performance at trial falls short of the constitutionally adequate legal representation required. *Smith v. State, supra.*

In the instant case, defendant bases his claim of ineffective representation on the cumulative effect of several errors and claims these errors were the result of inadequate preparation by his attorney and the minimal consultation time which the attorney spent with him. Specifically he alleges that a potentially meritorious alibi defense was never presented, the state's chief witness was not effectively impeached, and major strategic decisions, such as the possibility of a separate trial and the advisability of defendant testifying in his own behalf, were never discussed with him. Since the

burden is on defendant to present specific facts which prove these allegations, it is necessary to review all of the facts in detail. The state's case was based wholly upon circumstantial evidence.

The record shows that on the morning of February 24, 1972, two men, armed with pistols and wearing ski masks, robbed a branch of the American Fletcher National Bank in Cumberland, Indiana. During the course of the robbery, a deputy sheriff was shot and killed. Defendant's cousin, William E. Adams, was arrested on the day following the robbery and defendant was apprehended three days later. Defendant was never positively identified as one of the robbers, but his car was identified as the get-away car used during the crime. William Adams gave the FBI a signed statement confessing his part of the robbery. He refused to identify his partner in the robbery, but consistently claimed that defendant was not the one.

The case was venued to Allen County where defendant and William were both convicted at a joint trial in September, 1972. William was represented by a public defender from Allen County, while defendant was represented by an attorney he had retained in Indianapolis. William's attorney, Barrie Tremper, handled the filing of all papers in Allen County, while defendant's attorney was responsible for the investigation in Indianapolis. Both men were represented by these same attorneys on their direct appeal, but defendant had declared his status as an indigent at that time and his attorney was then paid by the court.

The state's case at trial was essentially based on the alleged statements made by defendant to two men after the robbery. One witness, James Taylor, testified at trial that he knew both defendant and William Adams as acquaintances and patrons of his bar. He stated that on the day of the robbery defendant and William had come to his house with a bag of money and two pistols and that defendant said he had shot a man and wanted to use Taylor's truck. The other witness, Royce Richey, was William's brother-in-law. Richey testified that William and defendant came to his house on the day of the robbery and one of them stated that they had "wasted" a man. None of the witnesses from the bank could identify defendant as the second robber even though his attorney continuously had him stand up and speak words to them at trial.

Defendant's counsel did not present any defense witnesses except William Adams. William admitted that his signed statement which he gave to the police was true and further stated that defendant was not his accomplice in the robbery. He said he could not reveal the name of his accomplice because he was in fear for his life if he did. After that testimony, William refused to answer any further questions by taking the Fifth Amendment. The jury found both William and the defendant guilty of first-degree murder and felony murder. At a brief sentencing hearing, both men were sentenced to life imprisonment. Both William and defendant brought a direct appeal to this Court which resulted in an affirmance of their convictions.[1]

At the post-conviction relief hearing, defendant had been assigned new counsel. He presented several witnesses to substantiate his claim that he had been denied effective assistance of counsel at trial. First, he testified that he had met his attorney once, for a brief time, in the Marion County Jail a day or two after he was arrested and talked with him about five minutes. He did not see his attorney again until the first day of trial, six to seven months later. He wrote to his family several times and asked them to contact the attorney, but his family told him that they could not get hold of him either. Defendant said he wanted a separate trial from

1. At one point during the course of the direct appeal, defendant's attorney was ordered by this Court to re-brief the case as the original appellate brief was inadequate. During oral argument before this Court, the attorney was further reprimanded for not preparing adequately for the appeal. It appeared that substantially all of the appellate work was done by William's attorney. Defendant's attorney is now deceased.

William and also had a list of witnesses he thought should be called on his behalf. No motion for a separate trial was filed and none of his witnesses was called at the trial. Defendant stated that the attorney never asked him what had happened on the day of the crime and never discussed any trial strategy with him. He told the attorney that he was not guilty and that he wanted to testify at the trial. The attorney told him he could testify, but when the trial started he said it would be better if he just stood up and asked permission to address the jury during the closing argument. The court did not grant this permission, so defendant jumped up and told the court that he wanted to testify and had not been allowed to. Defendant stated that he had talked to William's attorney in Fort Wayne a few times prior to the trial, but only for brief intervals.

Defendant next presented two witnesses who contradicted parts of the state's case. Neither of these witnesses had testified at the original trial. Defendant's landlady, Viola Richards, stated that she watched and noted what went on at defendant's house pretty carefully. She stated that a few days prior to the bank robbery, she saw James Taylor come to the house and exchange guns with William, who was living with defendant at that time. Then, on the morning of the robbery, she saw William and another man she identified as James Taylor leave the house in defendant's car. She was sure defendant was not the second man. She said she had talked to defendant's attorney about what she saw and he told her he would subpoena her for the trial. However, she was never subpoenaed on defendant's behalf. She finally did receive a subpoena from the state as she had been interviewed by the police after the robbery. She testified that she was told to wait at home during the trial and that she would be called and told when she was needed so she wouldn't have to drive up to Fort Wayne each day. She stated that she did wait at home and was told not to come for several days; then a personal emergency arose, so she called her attorney to ask him to take care of the subpoena and left to take care of the emergency.

Another witness who testified for defendant was Paula Vails, his girlfriend. She testified that defendant had spent the night before the robbery at her house and that he didn't leave until shortly before 11:00 a. m. Defendant told her he was going to meet William at the Mahogany Bar (Taylor's bar) and then finish some painting at his parents' house. Vails testified that she went to the attorney's office with defendant's sister and told him all of the above facts. He told her she would have to be a witness at the trial, but she was never subpoenaed. Vails went to the trial anyway with defendant's family. On the last day of the trial, Vails and defendant's family ate lunch with the attorney. He told her he was going to call her as a surprise witness and therefore she should not go back into the courtroom that afternoon. He told her to hide in the car and someone would come to get her when it was time for her to testify. However, no one ever came until late in the afternoon when one of defendant's family came out and told her the case had already gone to the jury. Vails's testimony about the attorney asking her to hide in the car was corroborated by Thomas Haggard, a friend of defendant's family, who was also eating lunch with them that day, and by defendant's sister.

Defendant testified that during the closing argument, which was not recorded, his attorney mentioned that he had been a personal friend of the deputy who was killed and that was the first time defendant knew about that. Haggard testified that he had seen defendant's attorney eating lunch with the victim's sister and family on one of the days of the trial.

Defendant's sister, Judy Sullivan, testified that she continuously received letters from defendant while he was waiting for his trial asking her to contact the attorney and have him come and talk with him. The attorney told her at one point that he was not a babysitter for her brother. Defendant's mother said she tried to contact the attorney many times and did give him a list of witnesses to interview. She said defend-

ant's attorney told her that he was too busy in Indianapolis to go to Fort Wayne and that William's attorney was taking care of things up there.

William Adams testified about the events on the day of the robbery. He said that Taylor had helped to plan the robbery and the second robber was a friend of Taylor. He said it was Taylor who left defendant's house with him on the morning of the robbery.

The state presented testimony to show that defendant's attorney had visited the Marion County Jail three times after defendant was arrested and before he was transferred to Allen County. However, there was no clear evidence that the attorney actually saw defendant on each of those visits as he also had other clients in the jail. William's attorney, Barrie Tremper, testified that he had worked closely with defendant's attorney at the trial of this cause. He relied on him to do the interviewing and investigating in Indianapolis while he filed the necessary motions and paperwork in Fort Wayne. He said he had many discussions with defendant's attorney about the case and received several lengthy letters reviewing their strategy and decisions. He said he thought defendant's attorney had come to Fort Wayne about half a dozen times before the trial, but *he didn't know if the attorney ever actually saw defendant on those visits.* Tremper, personally, saw defendant three or four times prior to the trial, but only for brief conferences lasting five to fifteen minutes. Tremper said he never knew defendant had requested a separate trial and did not know anything about Vails as a possible alibi witness for defendant.

The record does show that the defendant's attorney cross-examined the state's witnesses and had apparently reviewed some of the witnesses' statements prior to trial. However, this cross-examination was focused on the general truthfulness of the witnesses' testimony and not on specific points important to defendant's case, such as how long Taylor had really known the defendant and his family. The record

shows that the attorney had never personally interviewed the state's crucial witnesses, James Taylor and Royce Richey. During the trial, the attorney stated that he did not have copies of certain witnesses' statements but the prosecutor replied they had been given to his son several weeks previously. The attorney, at different points during the trial, had defendant walk in front of the jury wearing certain clothing allegedly worn by the robber but not admitted into evidence because of an illegal search.

This case involves those attorneys' functions which are difficult to evaluate for constitutional adequacy. However, defendant has presented us with an affirmative factual basis demonstrating the ineffective representation. Here, defendant was faced with the serious charge of murder and the state's case against him was not strong, being based upon circumstantial evidence and the alleged general remarks made by defendant to two witnesses who were not eyewitnesses to the crime. His co-defendant had admitted his own part in the crime. Yet, counsel failed to move for a separate trial, spent only a bare minimal time in consultation with defendant, neglected necessary investigation, failed to interview essential witnesses, and generally refused to talk to defendant or his family during most of the six months defendant was in jail prior to trial. The attorney never discussed any trial strategy with defendant other than to promise him he could testify. This promise was misleading because defendant was never allowed to testify or address the jury. The attorney put on virtually no defense and failed to call any witnesses at trial to support defendant's alibi defense although these witnesses were readily available and one attended every day of the trial. Here, it is clear the defendant's trial counsel's acts and omissions resulted in the withholding of a potentially meritorious defense. There was a lack of adequate consultation with defendant prior to the trial resulting in several strategic choices being made contrary to defendant's expressed wishes. No effective impeachment evidence about the state's chief witness, James Taylor, was used at the trial although de-

fendant has shown it was available. The totality of circumstances in this case shows that the quality of representation by defendant's trial attorney fell far short of the adequate legal representation standard we require. While it is clear that the Constitution does not guarantee errorless or infallible counsel, the errors in the instant case show a lack of reasonable investigation and adequate preparation. The representation as a whole was completely inadequate under our established standards.

I would grant the defendant a new trial.