**Fredrick James PORTER,**
**Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 65A01–0007–CR–218.

Court of Appeals of Indiana.

March 15, 2001.

William W. Gooden, Mt. Vernon, IN, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Janet L. Parsanko, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Frederick Porter ("Porter") appeals his conviction by jury of criminal recklessness as a class D felony.

We affirm.

### ISSUES

1. Whether the trial court erred by denying Porter's motion to suppress.

2. Whether there was sufficient evidence to support Porter's conviction.

### FACTS

The facts most favorable to the judgment reveal that during the early morning hours of December 18, 1999, Porter and Deangelo Brewer ("Brewer") were waiting outside the rear entrance to the Lucky Linda tavern in Mt. Vernon. Porter was carrying a green duffle bag containing a pistol gripped pump action shotgun. When John Sydnor ("Sydnor") and Patricia Stewart ("Stewart"), Brewer's ex-wife, exited the tavern, Porter handed the shotgun to Brewer. Brewer fired a single shot striking Stewart in the head and back.

After police arrived, witnesses advised Officer Daniel Prow ("Officer Prow") that Brewer was the shooter. Sydnor informed Officer Prow that Porter was also involved. Subsequently, both men began searching the area for Brewer. The two came upon Porter and his girlfriend, Angelic Hobby. After a short conversation, Officer Prow proceeded to the Southwind Apartments to speak to Brewer's girlfriend, Stephanie Washington. She allowed Officer Prow to search the apartment, but he did not find Brewer.

Officer Prow then observed Porter walking to his apartment. Porter allowed Officer Prow to search his apartment for Brewer. However, Brewer was not there. After observing several photographs of Porter holding a pistol gripped pump action shotgun on the kitchen table, Officer Prow returned to the tavern. At the scene, he learned that a shotgun was used and read several witness statements implicating Porter's involvement in the shooting. Officer Prow returned to the Southwind Apartments and arrested Porter.

Porter was taken to the Posey County Jail and was advised of his *Miranda* rights. Porter began answering Officer Prow's questions. Officer Prow told Porter that witnesses had identified him as being at the scene of the shooting. Porter said that they were lying and that "people [had] been trying to run him out of Mt. Vernon for awhile." (R. 315). Porter also

denied owning a shotgun. Shortly thereafter, Porter told Officer Prow that "he felt that he should talk to a lawyer before answering any more questions." (R. 111). After invoking his Fifth Amendment right to have an attorney present during questioning, Porter again stated that people had been trying to run him out of town, and that he would not be able to work and take care of "the cats and ... [his] apartment" if were put in jail. (R. 111).

Remembering the photographs in Porter's apartment, Officer Prow then asked Porter if he would consent to a search of his apartment. Officer Prow stated that it would be "real easy for [him] to go get a search warrant for" the apartment. (R. 123). Officer Prow told Porter that he would take someone trusted to the apartment, and advised Porter of his right to consult an attorney before consenting to the search. Porter then signed a consent to search form and Officer Prow went to the apartment, "looked through a few drawers," and seized the photographs. (R. 322).

Porter was subsequently charged by information on December 20, 1999 with aggravated battery as a class B felony. On January 21, 2000, the information was amended to include two additional counts of criminal recklessness as class C and D felonies. Porter filed a motion to suppress the photographs seized from his apartment claiming that his Fourth, Fifth, and Sixth Amendment rights had been violated. At a hearing on February 9, 2000, the trial court found that Porter had been advised of his right to counsel prior to consenting to the search and denied his motion to suppress.

On April 5, 2000, the jury heard evidence. At trial, Stewart testified that she and Brewer got into an argument earlier that evening. She stated that Brewer had called her a bitch and said that no one was going to mess with him because he had his gun. Stewart stated that after spending time at the tavern, she started to walk home, but returned to the tavern because Brewer was following her. Stewart testified that she eventually left the tavern with Sydnor. When Stewart exited the tavern, she saw Brewer "standing up against the building...." (R. 212). Stewart then heard a gunshot, noticed that her head hurt, saw the blood, and ran back into the tavern.

Sydnor testified that he arrived at the tavern around 2:30 a.m., and that he and Brewer did not get along with each other. Sydnor stated that he left to give Stewart a ride home. He testified that upon leaving the tavern, he saw Porter and Brewer "standing up against the wall." (R. 228). Sydnor then stopped to talk to a friend, Tabitha Smith ("Smith"), who was parked in the alley. When he turned, Sydnor stated that he heard a gunshot, ducked, and saw Porter and Brewer running away. Smith also testified that she observed two black men "come from behind the mini mall building." (R. 244). Smith also testified that after hearing the gunshot, she saw one of the men put a shotgun inside his vest. She described one of the men as stocky, wearing a vest with a hooded sweatshirt, and having bushy hair. The other man was taller and had fairer skin.

Alfred Kincaid, a regular patron, testified that he arrived at the tavern at around 1:30 a.m. He observed an argument between Porter's girlfriend and another patron, Jerry Lee ("Lee"). He escorted Lee outside through the rear exit and noticed Brewer and Porter "across from Lucky Linda's at the corner of a building looking out to see who was coming out...." (R. 150).

Additionally, Brewer, having already pleaded guilty to criminal recklessness for this shooting, testified that he and Porter were drinking together before they went to the tavern. Brewer said that they eventually left the tavern and went to see his girlfriend at Southwind Apartments. Brewer stated that prior to leaving the apartments, Porter came "out of the woods with a green bag." (R. 286). He said that

they both then returned to the tavern where Porter waited outside. When Brewer returned to tell Porter he "was getting ready to leave," Sydnor came out of the tavern. (R. 288). Brewer stated that Porter produced a pump action shotgun. Brewer "[g]rabbed the gun from Mr. Porter, and just aimed." (R. 289). He testified, "I didn't even aim to directly hit the man, I just aimed.... I just aimed it at him and pulled the trigger and it went off." (R. 289).

Further, Donald Littlepage ("Littlepage"), a Mt. Vernon sanitation worker, testified that he found a pump action shotgun when picking up garbage on his route two days later. Littlepage also said that when he found out about the incident, he took Kenneth Rose ("Rose"), an investigator with the Posey County Prosecutor's Office, to the place were he found the shotgun. Additionally, Rose testified that he found a green bag on top of an air conditioning unit of a building behind the tavern. He also stated that during the night "a combination of street lights and dusk to dawn lights and flood lights" illuminated the area. (R. 272).

After evidence was heard, the jury found Porter not guilty of criminal recklessness as a class C felony, but guilty of criminal recklessness as a class D felony. Because of Brewer's conviction, the State dismissed the charge of aggravated battery.

### DECISION

1. *Motion to Suppress*

Porter argues that the trial court erred by denying his motion to suppress. Specifically, he argues that Officer Prow's request for his consent to search the apartment violated his Fourth, Fifth, and Sixth Amendment rights. As a result, the trial court should have suppressed the admission of the photographs into evidence.

When we review the denial of a motion to suppress evidence,

[w]e review the record for substantial evidence of probative value to support the trial court's ruling. We do not reweigh the evidence. We resolve conflicting evidence in favor of the trial court and consider any substantial uncontroverted evidence. If the basis for the ruling on a motion to suppress is unclear, we will uphold the trial court if a reasonable view of the evidence supports the trial court's decision. The credibility of witnesses is for the trial court to determine.

*Moore v. State,* 723 N.E.2d 442, 448 (Ind. Ct.App.2000) (quoting *Willsey v. State,* 698 N.E.2d 784, 789 (Ind.1998) (citations omitted)).

The Fifth Amendment of the Federal Constitution states, "No person shall be ... compelled in any criminal case to be a witness against himself,...." The Amendment is applicable to the States through the Fourteenth Amendment. *Avery v. State,* 265 Ind. 417, 355 N.E.2d 395 (1976).

Addressing the Fifth Amendment, the United States Supreme Court has held "that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). If an individual is taken into custody and is going to be questioned, he must be advised, prior to any questioning, that he (1) has the right to remain silent; (2) that anything he says can be used against him; (3) that he has the right to the presence of an attorney; (4) that an attorney will be appointed if he cannot afford one; and (5) that he can exercise his rights at any time during questioning. *Id.* Failure to give this warning or show waiver renders any evidence obtained during questioning inadmissible. *Id.*

The presence of an attorney is essential to protecting the right against self-

incrimination. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Court held that once the accused has invoked his right to have an attorney present, the police cannot reinitiate questioning until an attorney is provided. *Id.* Further, questioning still cannot be reinitiated even after an attorney has been provided. *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). However, questioning can be reinitiated after a valid waiver is shown. *Edwards*, 451 U.S. 477, 101 S.Ct. 1880.

■ The Court has held that "waivers of counsel, must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including background, experience, and conduct of the accused.'" *Edwards*, 451 U.S. at 482, 101 S.Ct. 1880 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). We follow this rule in Indiana. In determining whether *Miranda* rights have been voluntarily waived, we consider the totality of the circumstances including whether "violence, threats, or other improper influences ... overcame the defendant's free will." *Carter v. State*, 730 N.E.2d 155, 157 (Ind.2000). Further, the State must prove the voluntariness of the waiver of *Miranda* rights by a preponderance of the evidence. *Sauerheber v. State*, 698 N.E.2d 796 (Ind. 1998).

■■ In this case, we are faced with whether Porter waived his *Miranda* rights after the assertion of his right to have an attorney present. We find that he did not. It is undisputed that Porter unequivocally invoked his right to an attorney. The record shows that Porter stated that "he should talk to his lawyer before answering any more" questions. (R. 111). After Porter invoked his right, Officer Prow stated that Porter was "really upset about his circumstances." (R. 111). He testified that Porter immediately began to comment about how people were trying to run him out of town, and that he would not be able to take care of his cat and apartment if he were sent to jail. Subsequently, Officer Prow told Porter that a search warrant could easily be obtained and then asked Porter for his consent to search his apartment.[1]

■ We do not find Porter's comments to be a knowing, intelligent, and voluntary waiver of his right to have an attorney present. His comments were of a general nature and do not indicate a willingness for Officer Prow to elicit incriminating statements. Again, we hold that once the accused has invoked his right to have an attorney present, police *must* stop questioning, whether or not the accused has consulted an attorney, unless the accused has reinitiated communication and made a knowing, intelligent, and voluntarily waiver of his right. If no waiver can be shown, no evidence gained as a result of the subsequent questioning will be admissible. *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602.

■ Because Officer Prow's request for Porter's consent to search the apartment violated Porter's Fifth Amendment right to have an attorney present during questioning, the photographs seized are inadmissible. Therefore, the trial court erred in denying Porter's motion to suppress. However, "[s]tatements obtained in violation of *Miranda* and erroneously admitted are subject to harmless error analysis." *Alford v. State*, 699 N.E.2d 247, 251 (Ind.1998). Our review is

1. This court is troubled by Officer Prow's effort to gain Porter's consent to search the apartment by threatening to get a search warrant. If obtaining a search warrant was as easy as Officer Prow claimed, then he should have done so. We have held that when a police officer threatens to get a search warrant unless he is allowed to enter the place to be search, any subsequent consent is illusory. *State v. Barker*, 734 N.E.2d 671 (Ind.Ct.App. 2000). As a result, Officer Prow's seizure of the photographs violated Porter's Fourth Amendment right against unreasonable search and seizure.

de novo and the error must be harmless beyond a reasonable doubt. *Id.* The State must show that the admission of the evidence did not contribute to Porter's conviction. *Id.* " 'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " *Id.* (quoting *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991)).

In this case, we find that the photographs did not contribute to the verdict because the jury had additional direct evidence to weigh. For example, Brewer, testified that he saw Porter emerge from the woods at Southwind Apartments with a green bag. He also stated that Porter gave him the shotgun. Sydnor and Kincaid testified that they saw Porter waiting outside of the tavern before the shooting. Littlepage stated that he found a shotgun near the tavern, and the shotgun was introduced into evidence as State's exhibit number 7. Further, Brewer stated that he had seen the shotgun at Porter's apartment and identified it as the gun he shot on December 18th. Additionally, Rose testified that he discovered a green bag on an air conditioning unit behind the tavern. As a result of this evidence, the photographs seized from Porter's apartment were unimportant. Therefore, the erroneous admission of the photographs was harmless error.

2. *Sufficiency of the Evidence*

Porter argues that there was insufficient evidence for the jury to convict. Specifically, he argues that he did not knowingly or intentionally aid, induce, or cause Brewer to shoot Stewart.

When reviewing a challenge to the sufficiency of the evidence, we will not reweigh the evidence or judge the credibility of witnesses. *Wallace v. State*, 722 N.E.2d 910, 912 (Ind.Ct.App.2000). "We look to the evidence and the reasonable inferences therefrom that support the judgment. The conviction will be affirmed if evidence of probative value exists from which a fact-finder could find the defendant guilty beyond a reasonable doubt." *Id.*

Under our accomplice liability statute, the State had to prove beyond a reasonable doubt that Porter knowingly or intentionally aided, induced, or caused Brewer to commit the crime of criminal recklessness. Ind.Code § 35–41–2–4. The elements of criminal recklessness involve the reckless, knowing, or intentional performance of an act that creates a substantial risk of bodily injury while armed with a deadly weapon. Ind.Code § 35–42–2–2(b)(1). Indiana's accomplice liability statute "does not establish it as a separate crime, but merely as a separate basis of liability for the crime charged." *Hampton v. State*, 719 N.E.2d 803, 807 (Ind.1999). "An accomplice who acts in concert with another who actually committed the direct acts which constitute the elements of the crime is equally as liable as a principal for all acts which are a natural and probable consequence of the plan." *Tynes v. State*, 650 N.E.2d 685, 687 (Ind.1995).

In this case, we find that there was overwhelming evidence of probative value for the jury to find Porter guilty beyond a reasonable doubt of criminal recklessness. As we noted in our harmless error analysis, Brewer testified that Porter brought the shotgun to the tavern, took the shotgun out of a green bag when Sydnor exited the tavern, and gave it to him. Other witnesses also placed Porter at the scene of the shooting. As a result, the jury was free to draw the reasonable inference that Porter intended to aid, induce, or cause Brewer to create a substantial risk of bodily harm to Stewart.

Affirmed.

RILEY, J., and ROBB, J., concur.