Mark Levoy **KELLEY**, Appellant–Defendant,

v.

**STATE of Indiana, Appellee.**

No. 20A03–0407–CR–311.

Court of Appeals of Indiana.

April 14, 2005.

---

Kenneth R. Martin, Goshen, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Maureen Ann Bartolo, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Mark Kelley appeals from his conviction for Possession of Methamphetamine as a Class C felony.[1] He presents one main issue for our review, whether a statement he made to police and evidence seized following that statement should have been admitted at trial. His argument also presents a second issue which we must resolve, whether testimony from a motion to suppress hearing may be considered in determining whether evidence is admissible during trial.

We affirm.

On January 8, 2003, Kelley was at the house of his cousin, Rob Smith. Two individuals came to the residence and wanted to speak to Smith. They got into an argument about money Smith owed to one of the individuals, Ernesto, and Smith was shot and killed. Kelley was a witness to the crime but was not harmed. He called 911 to report the shooting and then removed a safe from the house and placed it in the pickup he was driving. Kelley had been told by Smith to get rid of the safe should something happen to Smith. Upon returning to the house, Kelley saw Smith's handgun lying on the floor and picked it up.

Once police arrived, Kelley agreed to accompany them to the police station to give a statement. At some point before being interviewed, Kelley gave the handgun to Detective Terry Whitley of the Elkhart City Police Department but did not indicate where he got it. After discussing the shooting with Detective Whitley, Kelley agreed to remain at the police station should additional information be needed. While he waited, Kelley went into the parking lot and smoked a cigarette and talked with his family. After concluding that Kelley likely had more information which he did not reveal, Detective Carlton Conway, the lead investigator, went into the parking lot and asked Kelley if he would come into the station and answer some additional questions. Kelley agreed, and twenty to thirty minutes into the interview, he indicated that his first statement was not complete. Detective Conway continued to question Kelley until Kelley told him that he removed the safe and the handgun from the crime scene. Detective Conway then left the interview room and discussed the case with the other detectives. They concluded that they needed a search warrant to retrieve the safe. While other officers secured a warrant and retrieved the safe and its contents, Detective Conway continued to question Kelley. During this time, he implicated himself in drug dealing activities with Smith. He was arrested and charged.

Kelley presents his argument both as an appeal from the denial of a motion to suppress and from the admission of evidence at trial. In so doing, he draws upon the potential difference in reviewing adverse rulings made as to those individuals who seek an interlocutory appeal following the denial of a motion to suppress and those who wait to challenge the admission of evidence at trial.

In *Washington v. State,* 784 N.E.2d 584 (Ind.Ct.App.2003), this court reviewed the

---

1. Ind.Code § 35–48–4–6 (Burns Code Ed. Repl.2004).

admission of a handgun into evidence which had been found in the possession of a driver of a vehicle following a traffic stop. In that case, the parties framed the issue as the review of a denial of a motion to suppress. *Id.* at 586. However, this court determined that because Washington did not seek an interlocutory appeal, the issue was more appropriately framed as whether the trial court abused its discretion by admitting evidence at trial. *Id.* at 586–87. This court noted that once the matter proceeds to trial, the denial of a motion to suppress is insufficient to preserve an issue for appeal. *Id.* at 586. Rather, the defendant must make a contemporaneous objection to the admission of evidence at trial. *Id.* This court then held, "If the defendant makes such an objection and the foundational evidence is not the same as at the suppression hearing stage, the trial court must determine whether evidence is admissible based upon the testimony and evidence presented at trial." *Id.*

Kelley asserts that this pronouncement from the *Washington* court has changed the way decisions upon the admission of evidence are reviewed and places a higher burden upon defendants who wait until after trial to appeal than those who seek an interlocutory appeal. He argues this is so because of the standard of review applied in each circumstance.

■■■ However, in *Scott v. State,* 803 N.E.2d 1231, 1234 (Ind.Ct.App.2004), this court reviewed an in-trial admission of evidence after a motion to suppress had been denied. In doing so, the court relied upon *Marlowe v. State,* 786 N.E.2d 751 (Ind.Ct. App.2003), which was an interlocutory appeal from denial of a motion to suppress. The *Scott* court nevertheless stated, "In reviewing a motion to suppress, we do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial

court's ruling." 803 N.E.2d at 1234. The court added a caveat again citing *Marlowe,* "[U]nlike the typical sufficiency of the evidence case where only the evidence favorable to the judgment is considered, we must also consider the uncontested evidence favorable to the defendant." *Id.* Suffice it to say, regarding the admissibility of evidence, trial courts have broad discretion. *Washington,* 784 N.E.2d at 587. Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Id.* An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

■■■ Kelley argues that based upon the *Washington* court's holding—that when the foundational evidence is not the same at trial as at the motion to suppress hearing, the court must determine whether evidence is admissible based upon the testimony and evidence at trial—review of a denial of a motion to suppress is no longer available upon appeal following trial, and courts may no longer consider the uncontested evidence favorable to the defendant. We agree. Once the matter proceeds to trial, the question of whether the trial court erred in denying a motion to suppress is no longer viable. *See Beverly v. State,* 801 N.E.2d 1254, 1260 n. 5 (Ind.Ct. App.2004), *trans. denied; Packer v. State,* 800 N.E.2d 574, 578 (Ind.Ct.App.2003), *trans. denied; Washington,* 784 N.E.2d at 586. The logic behind this rule is that " 'a ruling upon a pretrial motion to suppress is not intended to serve as the final expression concerning admissibility.' " *Joyner v. State,* 678 N.E.2d 386, 393 (Ind.1997) (quoting *Gajdos v. State,* 462 N.E.2d 1017, 1022 (Ind.1984)). In other words, the preliminary ruling on the defendant's motion to suppress is subject to modification at trial. *Id.* Thus, Kelley's separate claim

that the trial court erred in denying his motion to suppress is moot. His claim is now solely whether the trial court erred in admitting the evidence at trial.

■ Nonetheless, the question still remains whether testimony and evidence from the motion to suppress hearing may be considered during trial. Our Supreme Court, in *Magley v. State,* 263 Ind. 618, 335 N.E.2d 811 (1975), *overruled on other grounds by Smith v. State,* 689 N.E.2d 1238 (Ind.1997),[2] weighed in on this dilemma in order to provide trial courts with some guidance when faced with a trial objection to a confession previously determined to be admissible. The Court stated:

"As a backdrop to proper consideration of this matter, it should be kept in mind that, in these situations, the State has already successfully met the issues raised in the challenge and shown beyond a reasonable doubt the voluntariness of the waiver and statement. When a simple objection for the purpose of preserving appellate rights is made, the trial judge should consider the pretrial determination res judicata [3] and binding upon him and overrule the objection. If, however, the trial objection is based upon new factual or legal matter, a simple overruling of the objection would not be appropriate. In that instance, the trial judge may expect, and indeed require, that he be provided with an accurate summary description of such new matter. Thereafter, either of two

levels of judicial response is appropriate. The trial judge may summarily overrule the objection if the new matter could in no event result in a determination of inadmissibility. This summary disposition may be made upon consideration of counsel's description, or, in the discretion of the judge, after having permitted the defense to call witnesses, to present its new matter. On the other hand, if the trial judge deems such new matter to be of sufficient substance, he may conduct a hearing on the motion to suppress [sic], having a scope appropriate under the circumstances, and reconsider the issue of admissibility. *Gasaway v. State* (1967), 249 Ind. 241, 231 N.E.2d 513. In *Rouse v. U.S.,* 123 U.S.App. D.C. 348, 359 F.2d 1014, (1966), the D.C. Court of Appeals identified the nature of new matter which would call for a further hearing, as matter first appearing at trial which casts 'reasonable doubt on the pre-trial ruling.'

Where, as in the case at bar, the judge who conducts the trial is not the judge who conducted and determined the pre-trial motion, obstacles to a full and fair reconsideration at trial exist. The trial judge is not acquainted with the evidence presented in the pre-trial hearing. Consequently, he is unable to weigh the old evidence with the new. This problem does not arise, of course, where the trial judge makes a summary

**2.** In *Jackson v. State,* 735 N.E.2d 1146, 1153 n. 4 (Ind.2000), our Supreme Court noted that in Indiana the State is required to prove the voluntariness of a confession beyond a reasonable doubt. The Court also noted that in *Smith, supra,* it had stated that the federal constitution requires the State to prove only by a preponderance of the evidence that a defendant's confession was voluntary. *Id.* When reviewing the voluntariness of a confession, we are to apply the beyond a reasonable doubt standard. *Id.*

**3.** The Court's suggestion that the doctrine of *res judicata* is applicable to pre-trial evidentiary rulings would appear to be an inadvertent error. *See Joyner,* 678 N.E.2d at 393. The comment presupposes that, as stated in the *Magley* opinion, the issue was "litigated and *finally determined* at the pre-trial stage." 263 Ind. at 635, 335 N.E.2d at 821 (emphasis supplied).

denial of the objection based upon an inadequate showing of substantial new matter. Neither does the problem arise when the new matter would provide an independent and sufficient ground for suppression, as in the case at bar. The problem would exist, where the trial judge deemed it appropriate to reopen an issue litigated and finally determined at the pre-trial stage, for, in such instances, reweighing of the new and old evidence as a body would be required. In such extreme cases, re-litigation of the motion to suppress is indicated. A transcript of the pre-trial hearing may or may not be used in such re-litigation, depending upon, for instance, whether the credibility of a single witness or existence of a single fact is undermined by the new matter. In such cases, the balance of the transcript, unrelated to that witness or that fact, might well serve in lieu of the live testimony of the State's suppression witnesses." 263 Ind. at 634–35, 335 N.E.2d at 821–22.

The Supreme Court revisited this issue in *Joyner, supra.* In *Joyner,* the Court interpreted the language from *Magley* and determined that trial judges need not necessarily rehear evidence and arguments relating to admissibility issues previously heard and determined during pretrial proceedings. 678 N.E.2d at 393. In essence, a trial court may hear evidence previously introduced at the pretrial suppression hearing when ruling upon the admissibility of evidence at trial, but it is not required

to do so. These two cases from our Supreme Court indicate that it is proper for trial courts to consider testimony and evidence from a pretrial motion to suppress hearing in addition to testimony and evidence introduced at trial.

 We now return to this court's statement in *Washington* to determine whether it comports with such interpretation of *Magley* and *Joyner.* The *Washington* court did not state that trial courts may not look back to testimony and evidence which was offered at the motion to suppress hearing. Rather, the holding was that where the foundational evidence is not the same, the trial court must make its determination based upon the testimony and evidence presented at trial. *Washington,* 784 N.E.2d at 586. Two logical conclusions flow from this. The first is that the trial court may reflect upon the foundational evidence from the motion to suppress hearing when that evidence is not in direct conflict with the evidence introduced at trial.[4] By this we mean that trial courts may not wholly dismiss direct evidence at trial and accept evidence from the motion to suppress hearing in its place.[5] This is related to the second logical conclusion flowing from *Washington,* when read with *Magley* and *Joyner*—that courts should consider evidence from the motion to suppress hearing which is favorable to the defendant and which has not been countered or contradicted by foundational evidence offered at the trial. If such were

---

**4.** We choose to employ the phrase "evidence is not in direct conflict" rather than "inconsistent" or "not the same," which was used in *Washington, supra,* for very specific reasons. Evidence that may be inconsistent or not the same may not necessarily controvert testimony or evidence which was previously considered. Such would occur when a party fails to fully develop the testimony of a witness at the trial, and thus, the trial testimony would not go as far as testimony from the motion to

suppress hearing. In those situations, the evidence would not be the same, but is not inherently contradictory. When such occurs, the trial court should look at the evidence from the motion to suppress hearing and rely upon it as appropriate.

**5.** This is not to say that a trial court could not determine that a witness was not credible at trial and discount that witness's testimony.

not allowed, the guidelines provided for. in *Magley* would be a nullity. We do not think our Supreme Court went to such great lengths to provide guidance for trial courts in considering motion to suppress testimony at trial unless the Court intended that trial courts and courts upon appeal may include a consideration of uncontradicted evidence presented at the motion to suppress hearing. Consequently, we will consider the foundational evidence from the trial as well as the evidence from the motion to suppress hearing which is not in direct conflict with the trial testimony.

We now turn to the heart of Kelley's appeal, whether the trial court erred in admitting into evidence a statement Kelley made to police and evidence seized as a result of that statement. Kelley argues that the statement was made without Miranda warnings, was involuntary, and the questioning should have ended when he requested to speak to an attorney. As previously stated, trial courts have broad discretion regarding the admissibility of evidence. *Washington,* 784 N.E.2d at 587. Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Id.* An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

Miranda warnings are used to secure a criminal defendant's right against compulsory self-incrimination. *Davies v. State,* 730 N.E.2d 726, 733 (Ind.Ct.App. 2000), *trans. denied, cert. denied* 532 U.S. 945, 121 S.Ct. 1410, 149 L.Ed.2d 352 (2001). A defendant is entitled to receive Miranda warnings when he is subject to custodial interrogation. *Id.* Custodial interrogation has been described as " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his free-

dom of action in any significant way.' " *Zook v. State,* 513 N.E.2d 1217, 1220 (Ind. 1987) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). A defendant is in custody if he is subjected to restraints on his freedom such that a reasonable person in defendant's position would believe he is not free to leave. *Davies,* 730 N.E.2d at 733.

In *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the United States Supreme Court was called upon to determine whether an individual was subject to custodial interrogation when he confessed to a burglary. The facts revealed that a police officer left a card at Mathiason's apartment asking him to call so that the officer could discuss something with him. Mathiason called and agreed to come to the state patrol office two blocks from his apartment. When he arrived, he was greeted by the officer who shook his hand and took him into an office. The officer told Mathiason that he was not under arrest. The two sat across a desk in an office with a closed door. Once the officer told Mathiason that he believed he was involved in a burglary, Mathiason sat for a few minutes and then said he had taken property from a residence. Mathiason was then informed of his Miranda rights and gave a taped confession.

The Supreme Court held that Mathiason was not in custody because there was no indication that the questioning took place in a context where his freedom to depart was restricted. *Id.* The Court then discussed what constitutes a custodial interrogation. It stated:

"Such a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any

interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited." *Id.* Several years later the Court revisited the issue and stated that a "policeman's unarticulated plan [to take the defendant into custody] has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

At the motion to suppress hearing, Kelley testified that he felt that he was free to leave at anytime during the initial interview with Detective Whitley. Indeed, after that interview he was able to go outside to smoke and talk with his family. However, he agreed to stay at the station in case the detectives had any further questions. It was what occurred after the break from the interview with Detective Whitley which he now challenges.

Detective Conway, who had some additional questions for Kelley, found him outside smoking a cigarette and asked him to come back in to answer questions. They went into an interview room which was the same as or similar to the one in which Kelley had earlier talked to Detective Whitley. Detective Conway told Kelley that he believed that Kelley had additional information which he had not shared. Kelley testified that he was afraid to divulge any further information, and that he did only after he was assured that he would not be arrested. Kelley then told Detective Conway that he had taken a handgun from the floor beside Smith. He also informed Detective Conway that he removed a safe from the house, which he had been told to do by Smith if something should happen to him, and that the safe contained methamphetamine and cash. At that time, Detective Conway then left the interview room and discussed the situation with several other detectives. They then procured a search warrant and found the safe in Kelley's vehicle which was parked in front of the residence in which Smith was killed. Just as Kelley had said, they found the safe to contain over 420 grams of methamphetamine and $410.00 cash.

After Detective Conway returned to the room following his discussion of the situation with the other detectives, a time period we will refer to as "Phase II" (as the parties did at trial), Kelley confessed that he had been involved in dealing drugs with Smith. This information was testified to by Detective Conway and was also included in the written statement which Kelley made during Phase II of the interview. That statement was introduced into evidence at trial.

Assuming for the sake of argument that Kelley was "in custody" during Phase II of the interview, it is possible that Kelley was not prejudiced because statements obtained in violation of Miranda are subject to harmless error analysis. When determining whether an error is harmless, our review is de novo and the error must be harmless beyond a reason-

able doubt. *Porter v. State,* 743 N.E.2d 1260, 1265–66 (Ind.Ct.App.2001). The State must show that the admission of evidence did not contribute to the conviction. *Id.* at 1266. To say that an error did not contribute to a conviction is to conclude that the error is unimportant in relation to everything else considered by the trial court on the issue in question, as revealed in the record. *Id.*

█ Kelley was charged with Possession of Methamphetamine with Intent to Deliver, as a Class A felony.[6] The State relied upon his statement in which he admitted that he had been involved in drug dealing with Smith to prove his intent to sell the methamphetamine which was in the safe. However, the trial court concluded that the evidence did not support the inference that Kelley was going to sell the drugs, only that he was going to "get rid of it" as ordered by Smith should something happen to him. Appendix at 142. Consequently, the trial court found Kelley not guilty of the Class A felony and instead found him guilty of Possession of Methamphetamine, a Class C felony, which requires no intent to deliver. *See* I.C. § 35–48–4–6. Thus, the statement in which Kelley implicated himself in dealing drugs in no way contributed to his conviction. Therefore, the admission of that information was harmless.

█ We now turn to the question whether Kelley was in custody during "Phase I" of the interview with Detective Conway.[7] Kelley claims that he did not feel that he could leave the interview with Detective Conway. Furthermore, he claims that Detective Conway was "mean" and repeatedly questioned him about drugs, not about the murder. Finally,

Kelley claims that he stated toward the end of Phase I that he wanted to speak to an attorney. According to Kelley, Detective Conway responded that he did not need an attorney because he would not be arrested.

Detective Conway's recollection of the interview was somewhat different. He stated at no time did he inform Kelley that he would not be arrested and that Kelley never mentioned speaking to an attorney. Detective Conway did not dispute that he repeatedly questioned Kelley about drugs. Rather, he acknowledged that his concern, once learning that Kelley had not included all relevant information in his previous statement to Detective Whitley, was to find out how Kelley had tampered with the crime scene and what was in the safe because it may have held the key to the murder.

In *Zook, supra,* our Supreme Court held under similar facts that the defendant was not in custody at the time he made an incriminating statement. In that case, a deputy fire marshal, Ron Taylor, contacted Zook, a suspect in a deadly fire, at 11:00 p.m. on a Sunday night and asked if he could meet with him that night. Zook drove to Bloomington from Indianapolis and arrived at the police station at midnight. Zook voluntarily went into an interview room with Taylor and the Chief Deputy Investigator of the State Fire Marshal's Office. At the commencement of the interview, Zook was informed of his right to remain silent and to stop answering questions if he wanted an attorney. He then waived his rights and answered questions about his presence at the fraternity house where the fire occurred. On at

---

6. Ind.Code § 35–48–4–1 (Burns Code Ed. Repl.2004).

7. "Phase I" is that period of time from the beginning of the interview until Detective Conway left the interview room to discuss the case with the other detectives.

least two occasions during the interview, Zook was told that he was not under arrest. Zook then admitted pouring paint solvent on a couch and setting it on fire. Zook was then arrested. The Court determined that under these facts, the defendant was not under arrest, nor could he have entertained a reasonable belief that he was in custody and not free to leave. 513 N.E.2d at 1222.

Given the facts before us both from the trial and the motion to suppress hearing, we conclude that the trial court did not err in concluding that Kelley was not in custody during Phase I of the interview. There is no evidence that Kelley could not have left the interview at any time, just as there is no evidence that Kelley was locked in the room when Detective Conway left. Kelley voluntarily stayed at the station so that he could provide any further details which may have been needed in order to apprehend the murderer of his cousin. Kelley was not a suspect in any crime until after he informed Detective Conway that he had taken the safe which Kelley knew to contain drugs. Importantly, the concern was not upon punishing Kelley for removing the safe and the handgun from the crime scene. Rather, the concern was that the police had all relevant information about the crime so that they could apprehend and prosecute the murderer. Finally, Kelley may have been told that as long as he told the truth he would not be arrested. That he was arrested because he implicated himself in criminal action by telling the truth does not mandate that we conclude that he was in custody during Phase I of the interview or that he had a reasonable belief that he could not leave. Consequently, the evidence from his admission that he took the safe which contained the drugs, as well as the drugs themselves, was properly admitted over Kelley's objection that it was obtained in violation of his Miranda rights.

 As a separate argument, Kelley claims that the statement should not have been admitted because his request for an attorney was denied by Detective Conway. He opines that once an individual requests an attorney, whether or not he has been informed of his Miranda rights, questioning should stop. This question was addressed by our Supreme Court in *Zook, supra.* In that case, the Court concluded that because Zook had not been taken into custody or otherwise deprived of his freedom when questioned, his right to counsel had not accrued. 513 N.E.2d at 1221. Thus, the Court stated that it need not reach the issue whether the defendant's questioning if he should get counsel was sufficient to invoke that right. *Id.*

Here the facts lead to the same result. Assuming that Kelley made the request to speak to an attorney, his right to counsel had not accrued because he was not in custody. Thus, the interview need not have stopped when the request was made and the admission of the evidence is not precluded.

 Kelley's final claim is that the statement was not voluntarily made. The admissibility of an incriminating statement is not determined solely by application of the Miranda rules. *Brabandt v. State,* 797 N.E.2d 855, 863 (Ind.Ct.App.2003). When a defendant is not in custody, an admission may be excluded because it was involuntarily made. *Id.* The Fifth Amendment privilege against self-incrimination is incorporated by the Fourteenth Amendment to the United States Constitution. *Id.* To be admissible consistent with these provisions, a suspect's statement must be voluntary. *Id.* A confession is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or de-

ceptive interrogation tactics that have overcome the defendant's free will. *Id.* The critical inquiry is whether the defendant's statements were induced by violence, threats, promises, or other improper influence.[8] *Id.* When reviewing a challenge to the trial court's decision, we do not reweigh the evidence but examine the record for substantial, probative evidence of voluntariness. *Kahlenbeck v. State,* 719 N.E.2d 1213, 1216 (Ind.1999).

■ Kelley argues that deception by Detective Conway rendered his statement involuntary. For support, he points to the purported promise that he would not be arrested if he told everything that happened. Additionally, he claims that he was threatened with being charged with perjury if he gave a false statement. Detective Conway agreed that he informed Kelley that he could be charged with perjury.[9]

In *Clark v. State,* 808 N.E.2d 1183, 1191 (Ind.2004), our Supreme Court was called upon to determine whether the defendant's confession to a murder had been induced by promises of leniency and lies. · There, the defendant stated that the officer interrogating him told him "that 'there's a way you can work around this,'" that the defendant would not have a future unless he was honest about what happened, that the officer believed that he did not mean to kill

anyone, and that multiple people had identified him as the shooter. *Id.* The Court noted that a confession is inadmissible if obtained by promises of mitigation or immunity, but vague and indefinite statements by the police that it would be in a defendant's best interest if he cooperated do not render a subsequent confession inadmissible. *Id.* Furthermore, " '[s]tatements by police expressing a desire that a suspect cooperate and explaining the crimes and penalties that are possible results are not specific enough to constitute either promises or threats.' " *Id.* (quoting *Kahlenbeck,* 719 N.E.2d at 1217). The Court then held that the statement was not involuntary just because the detective explained the varying offenses of homicide and suggested that the defendant would be better served by telling the truth. *Id.*

Here, while Kelley asserts that he was promised he would not be arrested for telling the truth, Detective Conway asserts that he did not make any such promises to Kelley. Consequently, to find in Kelley's favor we would be required to reweigh the evidence, which we will not do. Furthermore, Detective Conway testified that he did not have any reason to arrest Kelley until after the interview was completed and the search of the safe revealed the presence of drugs.[10] Thus, we conclude

---

**8.** Kelley also challenges the admission of his statement under the Indiana Constitution. However, he does not explain how the test under the Indiana Constitution is different than under the Federal Constitution. Our Supreme Court has held that the two Constitutions require similar considerations in determining whether a waiver of rights was knowing, intelligent, and voluntary. *Kahlenbeck v. State,* 719 N.E.2d 1213, 1216 n. 1 (Ind.1999). Furthermore, Kelley argues that the statement is inadmissible under the totality of the circumstances. This is the same test we apply to determine whether the statement was voluntarily made. Thus, we will conduct only one review of the claim under the totality of the circumstances.

**9.** We presume that Detective Conway meant that Kelley could be charged with the crime of False Informing which involves giving false information in the investigation of a crime knowing the report to be false. *See* Ind.Code § 35–44–2–2 (Burns Code Ed. Repl.2004). This is distinguishable from the crime of perjury which requires that a false, material statement must be made under oath with the individual knowing the statement to be false. *See* Ind.Code § 35–44–2–1 (Burns Code Ed. Repl.2004).

**10.** Detective Conway also testified that the safe was searched because it was removed from the crime scene and the possibility exist-

that Detective Conway did not make any promises which would render Kelley's statement involuntarily made.[11]

We also are not convinced that Detective Conway's acknowledgement that Kelley could be charged with perjury for false informing was a threat which rendered the statement involuntary. Detective Conway was doing no more than explaining the consequences of Kelley's actions should he give false information. This is proper given the Supreme Court's decision in *Kahlenbeck*, 719 N.E.2d at 1217, in which it stated that explaining crimes and penalties that are possible is not specific enough to constitute promises or threats.

The judgment is affirmed.

BAILEY, J., and MATHIAS, J., concur.

ed that the safe contained evidence which would indicate why Smith was killed.

11. It may be noted that Kelley was not arrested for telling the truth. In any event, the trial court was entitled to believe the officer's version of the interview with Kelley.